# Exhibit A

This case has been designated as an eFiling case. To review a copy of the Notice of Mandatory eFiling visit www.oakgov.com/efiling.

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND**

2019-175868-NP

ROBERT COOKE, *et. al.*,

    Plaintiffs,

vs.

FCA US LLC, *et al.*

    Defendants.

JUDGE LEO BOWMAN

CASE NO.: _____ NP

COMPLAINT AND
JURY TRIAL DEMANDED

PASKEL TASHMAN & WALKER, P.C.
**CLIFFORD PASKEL (P18680)**
**MICHAEL Z. ZAVIER (P76438)**
Attorneys for Plaintiff
24445 Northwestern Highway, Suite 102
Southfield, MI 48075
(248) 353-7750 / (248) 353-2253
cpaskel@ptwlegal.com
mzavier@ptwlegal.com

## NOTICE OF RELATED CASE

    This cases arises out of the same transaction or occurrence as the currently pending federal class action in *In re Chrysler-Dodge-Jeep Ecodiesel Marketing, Sales, Practices, and Products Liability Litigation*; 3:15-md-02777-EMC (N.D. Cal.).

*/s/ Clifford Paskel*
Clifford Paskel (P18680)

*(left margin, vertical text)* FILED   Received for Filing   Oakland County Clerk   8/14/2019 3:57 PM

## COMPLAINT AND JURY TRIAL DEMAND

Plaintiffs listed and set forth herein below file this Original Complaint and Jury Trial Demand complaining of (1) the Defendants collectively referred to as "Fiat Chrysler": FCA US LLC ("FCA"), Fiat Chrysler Automobiles N.V. ("Fiat"); (2) the Defendants collectively referred to as "VM Motori": VM Motori S.p.A. ("VM Italy") and VM North America, Inc. ("VM America"); and (3) the Defendants collectively referred to as "Bosch": Robert Bosch GmbH ("Bosch GmbH"), and Robert Bosch, LLC ("Bosch LLC") and for cause of action would show.

## INTRODUCTION

1.      This action arises out of an international race to the bottom. Fiat Chrysler, a rival of automaker Volkswagen struggling to compete on the world stage, sought to grab a piece of the U.S. "clean" diesel market with 2014-2016 EcoDiesel® trucks marketed under the Jeep Grand Cherokee and Ram 1500 model names (the "Fraudulent Vehicles"). But like Volkswagen, Fiat Chrysler fought dirty. That is, like Volkswagen did with its "clean diesels," Fiat Chrysler concealed from regulators and consumers alike that the EcoDiesel® trucks were far from "Eco."

2.      As the Environmental Protection Agency ("EPA") has since discovered, Fiat Chrysler, by and through FCA, concealed emission treatment software features in the Fraudulent Vehicle engine's diesel controls on applications for EPA Certificates of Conformity ("COCs") and California Air Resources Board ("CARB") Executive Orders ("EOs"). This hidden software, designed and implemented by Bosch GmbH and Bosch LLC, allowed the Fraudulent Vehicles to "pass" emission testing and obtain COCs and EOs so that Fiat Chrysler could import and sell the Fraudulent Vehicles in the U.S. and California, respectively. Once on America's roads, however, the emission controls are de-activated or severely restricted such that the Fraudulent Vehicles spew much higher amounts of polluting nitrogen oxides ("NOx") than permitted by

law.

3.      On January 12, 2017, the EPA issued a Notice of Violation ("NOV") against Fiat and FCA for failing "to disclose [eight] Auxiliary Emission Control Devices (AECDs)" in the 2014-2016 FCA Ram 1500s and Jeep Grand Cherokees.   In the NOV, the EPA explained that, despite having the opportunity to do so, Fiat and FCA failed to refute that the "principal effect of one or more of these AECDs was to bypass, defeat, or render inoperative one or more elements of design installed to comply with emissions standards under the [Clean Air Act.]"

4.      The same day, CARB publicly announced that it, too, had notified Fiat and FCA of its violations after detecting the AECDs in their 2014, 2015, and 2016 Jeep Grand Cherokee and Ram 1500 EcoDiesel® vehicles.  CARB also said Fiat and FCA failed to disclose the devices, which can significantly increase NOx emissions when activated.  "Once again," observed CARB Chair Mary D. Nichols, "a major automaker made the business decision to skirt the rules and got caught."

5.      The U.S. has since sued FCA, Fiat, VM Italy, and VM America for violating the Clean Air Act ("CAA") and applicable regulations, seeking injunctive relief and civil penalties. As the U.S. has found, "one or more of these undisclosed software features, alone or in combination with one or more of the others, bypass, defeat and/or render inoperative the [Fraudulent] Vehicles' emission control system, causing the vehicles to emit substantially higher levels of NOx during certain normal real world driving conditions than during federal emission tests."

6.      . American consumers were caught in the middle of Fiat Chrysler's scheme. Consumers have been wary of diesel engines as a relic of the past:  noisy and spewing thick, toxic smoke. This was an understandable concern.  A byproduct of diesel combustion is NOx,

a pollutant linked with serious health dangers and climate change. Seeking to expand the diesel market in the U.S., large automakers in the late 2000's sought to reimagine diesel for regulators and consumers alike. For its part, Fiat Chrysler touted its "EcoDiesel" technology as the best of both worlds: a "green" alternative to gasoline with reduced emissions coupled with diesel's benefits of greater torque, power, and fuel efficiency. Fiat Chrysler extracted a premium for these "EcoDiesel" trucks, selling them for thousands of dollars more than the cost of otherwise-comparable gasoline trucks.

7.     Contrary to its public representations, and concealed from consumers and regulators alike, Fiat Chrysler secretly programmed its EcoDiesel® vehicles with hidden software features that significantly reduced the effectiveness of the NOx reduction technology during real- world driving conditions. As a result, the Fraudulent Vehicles emitted harmful pollutants at levels that were illegally high and far in excess of what a reasonable consumer would expect from an "Eco" vehicle. On-road testing has confirmed that the Fraudulent Vehicles produced NOx emissions at an average of 222 mg/mile in city driving (four times the Federal Test Procedure ("FTP") standard of 50 mg/mile) and 353 mg/mile in highway driving (five times higher than the U.S. highway standard of 70 mg/mile). In many instances, NOx values were in excess of 1,600 mg/mile—more than 20 times governmental standards.

8.     Compounding this problem is the interplay between performance and emissions in diesel engines. Fiat Chrysler could not achieve the fuel economy and performance that it promises for the Fraudulent Vehicles without cheating on emissions—a fact that it concealed from consumers around the country.

9.     Fiat Chrysler did not act alone. At the heart of the diesel scandal is Bosch. Bosch GmbH and Bosch LLC, along with CEO Volkmar Denner ("Denner"), were active and

knowing participants in the scheme. Bosch designed, created, and tested the electronic diesel control ("EDC") units that allowed Fiat Chrysler to "pass" emission tests for its COC and EO applications. Bosch went so far as to boast that the "2014 Jeep Grand Cherokee features a Bosch emission system compliant with the most stringent emission regulations in the world. From fuel tank to tailpipe, Bosch is pleased to equip this vehicle with top technologies to give consumers a great driving experience requiring fewer stops at the pump." Bosch has since, however, acknowledged its role in the creation of defeat devices in certain Fiat Chrysler diesel vehicles sold in the European Union ("EU"). VM Italy and VM America also knowingly participated in the scheme by designing, manufacturing, and calibrating the "EcoDiesel" engines in the Fraudulent Vehicles.

10.     Plaintiffs hereby bring this action for violations of the federal Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1961, *et seq.* ("RICO")), common law fraud, and consumer protection laws.

11.     Plaintiffs seek a buyback of their Fraudulent Vehicles, monetary damages (including treble damages under RICO). Plaintiffs are also entitled to a significant award of punitive or exemplary damages, given that Defendants deliberately deceived Plaintiffs, disregarded their rights to make free and informed consumer choices, damaged them economically, and used them as unwitting puppets in a scheme that impaired the public health.

## PARTIES

### PLAINTIFFS

### THE ALABAMA PLAINTIFF

12.     Plaintiff Robert Cooke is a citizen of the State of Alabama who acquired a 2015 Dodge RAM 1500 in the State of Alabama. In deciding to acquire the vehicle, Plaintiff saw and

relied upon the "Ecodiesel" badge that was affixed to the vehicle, as well as the advertised fuel economy and performance. Plaintiff acquired the vehicle based on the representation the vehicle was "an "Ecodiesel" vehicle (i.e. reduced emissions and fuel efficient) as well as based on the advertised fuel economy and performance. Plaintiff further saw and relied on additional information and marketing conveying the message that the vehicle was environmentally friendly, had low emissions, and had good fuel economy and performance. All of these representations were material and false because the vehicle contains undisclosed emission cheating components that cause them to pollute excessively in real-world driving conditions. At the time of acquisition, Plaintiff did not know that the vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that the vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have acquired the vehicle, or would have paid less for it, had it been known that the vehicle did not comply with emission standards; that it did not have reduced emissions levels; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have acquired the vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

## THE GEORGIA PLAINTIFFS

13.     Plaintiff Frank Roach is a citizen of the State of Georgia who acquired a 2014 Jeep Grand Cherokee in the State of Georgia. In deciding to acquire the vehicle, Plaintiff saw and relied upon the "Ecodiesel" badge that was affixed to the vehicle, as well as the advertised fuel economy

and performance. Plaintiff acquired the vehicle based on the representation the vehicle was "an "Ecodiesel" vehicle (i.e. reduced emissions and fuel efficient) as well as based on the advertised fuel economy and performance. Plaintiff further saw and relied on additional information and marketing conveying the message that the vehicle was environmentally friendly, had low emissions, and had good fuel economy and performance. All of these representations were material and false because the vehicle contains undisclosed emission cheating components that cause them to pollute excessively in real-world driving conditions. At the time of acquisition, Plaintiff did not know that the vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that the vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have acquired the vehicle, or would have paid less for it, had it been known that the vehicle did not comply with emission standards; that it did not have reduced emissions levels; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have acquired the vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

14.     Plaintiff Jeff Gaskins is a citizen of the State of Georgia who acquired a 2015 Dodge RAM 1500 in the State of Georgia. In deciding to acquire the vehicle, Plaintiff saw and relied upon the "Ecodiesel" badge that was affixed to the vehicle, as well as the advertised fuel economy and performance. Plaintiff acquired the vehicle based on the representation the vehicle was "an "Ecodiesel" vehicle (i.e. reduced emissions and fuel efficient) as well as based on the advertised

7

fuel economy and performance. Plaintiff further saw and relied on additional information and marketing conveying the message that the vehicle was environmentally friendly, had low emissions, and had good fuel economy and performance. All of these representations were material and false because the vehicle contains undisclosed emission cheating components that cause them to pollute excessively in real-world driving conditions. At the time of acquisition, Plaintiff did not know that the vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that the vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have acquired the vehicle, or would have paid less for it, had it been known that the vehicle did not comply with emission standards; that it did not have reduced emissions levels; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have acquired the vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

15.     Plaintiff Adam Garner is a citizen of the State of Georgia who acquired a 2015 Dodge RAM 1500 in the State of Georgia. In deciding to acquire the vehicle, Plaintiff saw and relied upon the "Ecodiesel" badge that was affixed to the vehicle, as well as the advertised fuel economy and performance. Plaintiff acquired the vehicle based on the representation the vehicle was "an 'Ecodiesel' vehicle (i.e. reduced emissions and fuel efficient) as well as based on the advertised fuel economy and performance. Plaintiff further saw and relied on additional information and marketing conveying the message that the vehicle was environmentally friendly,

8

had low emissions, and had good fuel economy and performance. All of these representations were material and false because the vehicle contains undisclosed emission cheating components that cause them to pollute excessively in real-world driving conditions. At the time of acquisition, Plaintiff did not know that the vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that the vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have acquired the vehicle, or would have paid less for it, had it been known that the vehicle did not comply with emission standards; that it did not have reduced emissions levels; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have acquired the vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

### THE ILLINOIS PLAINTIFF

16.    Plaintiff John Pora is a citizen of the State of Illinois who acquired a 2014 Jeep Grand Cherokee in the State of Illinois. In deciding to acquire the vehicle, Plaintiff saw and relied upon the "Ecodiesel" badge that was affixed to the vehicle, as well as the advertised fuel economy and performance. Plaintiff acquired the vehicle based on the representation the vehicle was "an "Ecodiesel" vehicle (i.e. reduced emissions and fuel efficient) as well as based on the advertised fuel economy and performance. Plaintiff further saw and relied on additional information and marketing conveying the message that the vehicle was environmentally friendly, had low emissions, and had good fuel economy and performance. All of these representations were

material and false because the vehicle contains undisclosed emission cheating components that cause them to pollute excessively in real-world driving conditions. At the time of acquisition, Plaintiff did not know that the vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that the vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have acquired the vehicle, or would have paid less for it, had it been known that the vehicle did not comply with emission standards; that it did not have reduced emissions levels; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have acquired the vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

## THE MISSOURI PLAINTIFFS

17. Plaintiffs Paul Williams and Matthew Williams are citizens of the State of Missouri who acquired a 2015 Dodge RAM 1500 in the State of Missouri. In deciding to acquire the vehicle, Plaintiffs saw and relied upon the "Ecodiesel" badge that was affixed to the vehicle, as well as the advertised fuel economy and performance. Plaintiffs acquired the vehicle based on the representation the vehicle was "an "Ecodiesel" vehicle (i.e. reduced emissions and fuel efficient) as well as based on the advertised fuel economy and performance. Plaintiffs further saw and relied on additional information and marketing conveying the message that the vehicle was environmentally friendly, had low emissions, and had good fuel economy and performance. All of these representations were material and false because the vehicle contains undisclosed emission

10

cheating components that cause them to pollute excessively in real-world driving conditions. At the time of acquisition, Plaintiffs did not know that the vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor were Plaintiffs aware that the vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiffs would not have acquired the vehicle, or would have paid less for it, had it been known that the vehicle did not comply with emission standards; that it did not have reduced emissions levels; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiffs have suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have acquired the vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

## THE OHIO PLAINTIFFS

18.    Plaintiff Nancy Flint is a citizen of the State of Indiana who acquired a 2014 Jeep Grand Cherokee in the State of Ohio. In deciding to acquire the vehicle, Plaintiff saw and relied upon the "Ecodiesel" badge that was affixed to the vehicle, as well as the advertised fuel economy and performance. Plaintiff acquired the vehicle based on the representation the vehicle was "an "Ecodiesel" vehicle (i.e. reduced emissions and fuel efficient) as well as based on the advertised fuel economy and performance. Plaintiff further saw and relied on additional information and marketing conveying the message that the vehicle was environmentally friendly, had low emissions, and had good fuel economy and performance. All of these representations were material and false because the vehicle contains undisclosed emission cheating components that cause them to pollute excessively in real-world driving conditions. At the time of acquisition,

11

Plaintiff did not know that the vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that the vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have acquired the vehicle, or would have paid less for it, had it been known that the vehicle did not comply with emission standards; that it did not have reduced emissions levels; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have acquired the vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

19.    Plaintiff Jon Wilkins is a citizen of the State of Ohio who acquired a 2014 Dodge RAM 1500 in the State of Ohio. In deciding to acquire the vehicle, Plaintiff saw and relied upon the "Ecodiesel" badge that was affixed to the vehicle, as well as the advertised fuel economy and performance. Plaintiff acquired the vehicle based on the representation the vehicle was "an "Ecodiesel" vehicle (i.e. reduced emissions and fuel efficient) as well as based on the advertised fuel economy and performance. Plaintiff further saw and relied on additional information and marketing conveying the message that the vehicle was environmentally friendly, had low emissions, and had good fuel economy and performance. All of these representations were material and false because the vehicle contains undisclosed emission cheating components that cause them to pollute excessively in real-world driving conditions. At the time of acquisition, Plaintiff did not know that the vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that the vehicle

12

was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have acquired the vehicle, or would have paid less for it, had it been known that the vehicle did not comply with emission standards; that it did not have reduced emissions levels; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have acquired the vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

## DEFENDANTS

### The Fiat Chrysler Defendants

20.    Defendant FCA US LLC ("FCA") is a Delaware limited liability company. Defendant Fiat Chrysler Automobiles N.V. ("Fiat" or, together with FCA, "Fiat Chrysler") is FCA's corporate parent. Fiat's predecessor, Fiat S.p.A., began its acquisition of FCA's predecessor, Chrysler Group LLC, in 2009 and completed it in January 2014, at which time Chrysler Group LLC became a wholly-owned indirect subsidiary of Fiat and was renamed FCA US LLC. FCA's principal place of business and headquarters is at 1000 Chrysler Drive, Auburn Hills, Michigan 48326, and it may be served with process by service upon its registered agent for service at The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

21.    FCA is a motor vehicle manufacturer and a licensed distributor of new, previously untitled motor vehicles. FCA (like its predecessor, Chrysler) is one of the "Big Three" American automakers (with Ford and General Motors). FCA engages in commerce by

13

distributing and selling new and unused passenger cars and motor vehicles under the Chrysler, Dodge, Jeep, Ram, and Fiat brands. Other major divisions of FCA include Mopar, its automotive parts and accessories division, and SRT, its performance automobile division.

22. FCA has designed, manufactured, imported, distributed, offered for sale, sold, and leased two models of vehicle for which the EcoDiesel® option is available—the Ram 1500 and the Jeep Grand Cherokee—with the knowledge and intent to market, sell, and lease them in all 50 states, including in California. Moreover, FCA and its agents designed, manufactured, marketed, distributed, warranted, sold and leased the Fraudulent Vehicles throughout the United States. Dealers act as FCA's agents in selling automobiles under the Fiat Chrysler name and disseminating vehicle information provided by Fiat Chrysler to customers.

23. Fiat, the corporate parent of FCA, is a Dutch corporation headquartered in London, United Kingdom. Fiat owns numerous European automotive brands in addition to FCA's American brands, including Maserati, Alfa Romeo, Fiat Automobiles, Fiat Professional, Lancia, and Abarth. As of 2015, Fiat Chrysler is the seventh largest automaker in the world by unit production. Fiat may be served with process at its London headquarters, 25 St. James's St, St. James's, London SW1A 1HA, UK

24. Plaintiffs allege that Fiat employees oversaw or were responsible for approving elements of design and/or strategies related to emission compliance for the Fraudulent Vehicles. Fiat also imported into the United States, sold, offered for sale, introduced into commerce, or delivered the Fraudulent Vehicles, with the intent to market or sell them in all fifty states, including in California.

25. Fiat Chrysler developed and disseminated the owners' manuals, warranty booklets, product brochures, advertisements, and other promotional materials relating to the

14

Fraudulent Vehicles, with the intent that such documents should be purposely distributed throughout all fifty states, including in California. Fiat Chrysler is engaged in interstate commerce, selling vehicles through its network in every state of the United States.

### VM Motori Defendants

26.     Fiat also owns several auto parts manufacturers, including Defendant VM Motori S.p.A. ("VM Italy"), an Italian corporation headquartered in Cento, Italy, which designs and manufactures diesel engines for automobiles, including the Fraudulent Vehicles. Fiat partially acquired VM Italy in early 2011 by purchasing a 50% stake, and took full ownership by acquiring the remaining 50% from General Motors in October 2013. VM Italy may be served with process at its headquarters in Italy, VM Motori S.p.A., Via della Canapa 12, 44042 Cento, Ferrara, Italia.

27.     Defendant VM North America, Inc. ("VM America" or, together with VM Italy, "VM Motori") is or was a Delaware corporation and wholly-owned subsidiary of Fiat. VM America existed, at all relevant times, to support VM Italy customers and activities in North America. VM America's principal place of business is located at 1000 Chrysler Drive, Auburn Hills, Michigan 48326. Both VM Italy and VM America conduct business at that address and report to management at both VM Italy and VM America, including while working on the Fraudulent Vehicles. VM America may be served with process at by service upon its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

28.     VM Italy transacts business in the United States. VM Italy employees have been physically present in Auburn Hills, Michigan, while working on engine calibration and air emissions issues related to the Fraudulent Vehicles. Some VM America employees working in

Auburn Hills are also employees of VM Italy. VM Italy employees in Italy communicated regularly about the Fraudulent Vehicles with the VM America and VM Italy employees located in Auburn Hills. VM Italy also communicated frequently with FCA about the Fraudulent Vehicles.

29.     VM Motori designed, manufactured, calibrated, and delivered the EcoDiesel® engine system for inclusion in the Fraudulent Vehicles, knowing and intending that the Fraudulent Vehicles, along with their engine system, would be marketed, distributed, warranted, sold and leased throughout all 50 states, including in California.

## Bosch Defendants

30.     Defendant Robert Bosch GmbH ("Bosch GmbH")—a German multinational engineering and electronics company headquartered in Gerlingen, Germany—is the parent company of Defendant Robert Bosch LLC ("Bosch LLC" or, with Bosch GmbH, "Bosch"), a Delaware limited liability company with its principal place of business located at 38000 Hills Tech Drive, Farmington Hills, Michigan 48331. Bosch LLC may be served with process by service upon its registered agent at Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

31.     Both Bosch GmbH and Bosch LLC operate under the umbrella of the Bosch Group, which encompasses some 340 subsidiaries and companies. Volkmar Denner ("Denner") is the Chairman and CEO of Bosch GmbH and leader of The Bosch Group. Denner has been Chairman and CEO of Bosch since July 2012, after decades of working in Bosch's Engine ECU Development division, managing the development and sale of automotive engine computers, such as the EDC units that were installed in the Fraudulent Vehicles.

32.     The Bosch Group is divided into four business sectors: Mobility Solutions

16

(formerly Automotive Technology), Industrial Technology, Consumer Goods, and Energy and Building Technology. Bosch's sectors and divisions are grouped not by location, but by function. In other words, Mobility Solutions includes knowledgeable individuals at both Bosch GmbH and Bosch LLC. Regardless of whether an individual works for Bosch in Germany or the United States, the employee holds him or herself out as working for Bosch. This collective identity is captured by Bosch's mission statement: "We are Bosch," a unifying principle that links each entity and person within the Bosch Group.

33.    Mobility Solutions is the largest Bosch Group business sector. In 2014, the first full year of Fraudulent Vehicle sales, it generated sales of €33.3 billion, amounting to 68% of total group sales.

34.    The Bosch Group is one of the leading automotive suppliers globally. In 2015, Mobility Solutions generated sales of $9.5 billion in North America alone.

35.    Bosch embeds sales and engineering personnel at customer offices and facilities throughout the world, including automakers like Fiat Chrysler, to work directly on the design, sale, calibration, and configuration of the parts it supplies.

36.    Bosch operates 70 locations in the United States, with over 31,000 employees. One of these locations is the Bosch LLC Research and Technology Center North America in Palo Alto, California. One of Bosch's research focuses there is application-specific integrated circuit (ASIC) design and MEMS (microelectromechanical-system) technology. These technologies are used in a variety of automotive applications. Bosch LLC also operates Research and Technology Centers in Pittsburgh, Pennsylvania, and Cambridge, Massachusetts.

37.    Bosch developed, tested, configured, manufactured, and supplied the EDC Unit 17, which is the EDC system used in the Fraudulent Vehicles, knowing and intending that the

17

Fraudulent Vehicles, along with the device, would be marketed, distributed, warranted, sold and leased throughout all 50 states,. As set forth in detail herein, at all relevant times, Bosch, VM Motori, and Fiat Chrysler worked collaboratively to program the EDC Unit 17 in the Fraudulent Vehicles.

38.    From at least 2005 to 2015, Bosch and its employees were knowing and active participants in the creation, development, marketing, and sale of engine and emission control software designed to evade emission requirements in vehicles sold in the United States. These vehicles include the Ram 1500 EcoDiesel® and Jeep Grand Cherokee EcoDiesel®, as well as diesels made by other automakers such as Volkswagen, Audi, and Porsche.

39.    Bosch participated not just in the development of these devices, but also in the scheme to prevent U.S. regulators from uncovering their true functionality. Moreover, Bosch's participation was not limited to engineering these devices. In fact, Bosch marketed "clean diesel" technology in the United States. Bosch was therefore a knowing and active participant in the scheme or common course of conduct with Fiat Chrysler and VM Motori and others to defraud regulators and consumers.

## JURISDICTION AND VENUE

40.    Venue is proper in this County because Defendants Bosch LLC, VM America, and FCA have their principal places of business in Oakland County and conduct business in Oakland County. Venue is further proper because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this County. Defendants have marketed, advertised, sold, and leased the Fraudulent Vehicles, and otherwise conducted extensive business, within this County.

41.    The jurisdiction of this court is based on the amount in controversy, which exceeds Twenty-Five Thousand ($25,000.00) Dollars, exclusive of interest, costs, and attorney fees, and other matter is otherwise within the jurisdiction and venue of the Court.

42.    This Court has personal jurisdiction over Defendants 18 U.S.C. § 1965(b) and (d). The Court also possesses pendent personal jurisdiction over Defendants. Personal jurisdiction is further proper over FCA US LLC, Robert Bosch GmbH, and Robert Bosch LLC because those defendants maintain places of business in Michigan. This Court also has jurisdiction over Defendants because, at all relevant times, they designed, manufactured, sold, distributed, promoted and placed into the stream of commerce numerous diesel automobiles, including the automobiles at issue in this case. In addition, the fraudulent statements and omissions occurred, in part, in this district. Defendants also conduct business in Michigan and the causes of action asserted herein arose from and are connected to purposeful acts taken by Defendants in Michigan. Personal jurisdiction is proper in Michigan over Defendants because they caused tortious injury by an act or omission in Michigan and because they transact substantial business in Michigan.

## JURY TRIAL DEMAND

43.    Plaintiffs request a jury trial of this matter.

## FACTUAL BACKGROUND

### FIAT CHRYSLER SEEKS TO CAPITALIZE ON THE GROWING U.S. "CLEAN" DIESEL MARKET

44.    As part of a strategy to expand its North American presence, in 2009, Fiat began its acquisition of one of the "Big 3" U.S. automakers, Chrysler. In November of that year, CEO Marchionne unveiled an ambitious five-year plan to, among other things, roll out "more diesel variants" under the Jeep brand and to give Ram's "Light duty (1500)" pickup truck a

"refresh/facelift." By 2014, Fiat had become Fiat Chrysler Automobiles, Chrysler had become FCA, and VM Motori, a long time supplier, was now part of the Fiat Chrysler sprawling family of affiliated companies. In May of that year, Sergio Marchionne announced another five-year plan at FCA's headquarters in Auburn Hills, Michigan, to increase Fiat Chrysler's competitiveness against global auto giants, such as Toyota, Volkswagen, and General Motors, by increasing annual sales to 7 million vehicles by 2018, up from 4.4 million in 2013. Integral to the strategy was the expansion of the "Jeep portfolio" and updates to the "bread-and-butter Ram 1500," including "diesel engines."

45.       During this same time frame, emission standards in the United States were ratcheting up. In contrast to other global automakers, like Toyota and Ford, which were focusing on developing hybrid and electric cars, Chrysler—now FCA and under the control of Fiat—took another path: "[r]eflecting its ties with Europe-based Fiat, Chrysler appears to be taking yet another route that focuses less on electrification and *more heavily on light-duty diesels* and compressed natural gas."

46.       Indeed, as early as July 2010, Chrysler commissioned and presented research to "[i]dentify the trade-offs that consumers make relative to powertrain technologies"—including diesel—and "[i]dentify possible conquest opportunities associated with offering a RAM light-duty Diesel engine." FCA-MDL-001184465-524. Among other things, the study "recommend[ed] . . . [c]apitalizing on improved fuel economy to increase interest in a Light Duty Diesel engine among L[ight] D[uty] owners." *Id.*

47.       In December 2010, Chrysler requested a meeting with Bosch and Fiat to discuss "Chrysler's main motivation" of "captur[ing] the developing N[orth] A[merican] diesel market." RBL-MDL2777-PE-300169862-64. Bosch's notes of the meeting indicate that the projected

"profitability status" for SUVs (and other vehicle segments) was "medium to high (+$300 to +$800 margin per diesel vehicle)." *Id.* An additional meeting was planned for December 8, 2010 with "Chrysler, VM, [and] Bosch" to "discuss further," and a "Chrysler NA diesel decision meeting with Marchionne" was "scheduled for" December 11, 2010. *Id.*

48.     In 2012, Marchionne was quoted as saying, "with 2016 'just around the corner' and 2025 not far away given the auto industry's long product-development lead times, 'there are big choices to be made[.]'" Marchionne explained that "Chrysler, which is starting to share platforms and powertrains with Fiat, wants to leverage the European auto maker's strengths in *diesels* and CNG-powered vehicles." As one commentator put it at the time, "[f]uel-efficient towing remains a strong point of diesels, and Marchionne says he still is optimistic about the potential of light-duty diesels in the U.S. despite significant emissions challenges." This is further reflected in a March 2013 Chrysler research document entitled "Alternative Powertrain" in which the company sought to better understand the "needs, wants, expectations and functional requirements relative to . . . alternative powertrain technologies such as hybrids, electric, diesel, and compressed natural gas." FCA-MDL-001239766-774. The research concluded that "consumers want their next vehicle to do everything their current vehicle does, with better fuel economy and no sacrifice in usability," and further noted that "[l]arge segments (Pickups) with a need to tow and haul show most interest in Alternative fuels/technology for internal combustion engines."

49.     FCA ultimately decided to push into this market beyond its existing heavy-duty diesel trucks (which use engines from a different supplier, Cummins) and, in 2014, it introduced both the light-duty Ram 1500 "EcoDiesel®" and the Jeep Grand Cherokee "EcoDiesel®." These are the Fraudulent Vehicles at issue here.

50.     Fiat Chrysler was not alone. Seeing an opportunity for growth in the U.S. market, other major automakers rushed to develop and market "clean diesel" engines. Volkswagen, Mercedes-Benz, General Motors, and other manufacturers also began selling diesel cars and trucks as a more efficient (and thus environmentally-friendly) alternative to gasoline vehicles with no loss of power or performance: the advertised difference was that new emission control technology could make small diesel engines (long regarded by American consumers as fuel efficient but foul-smelling polluters) powerful and clean in addition to fuel-efficient. The marketing worked, and millions of diesel vehicles were sold and leased in the United States between 2007 and 2016.

51.     The green bubble for diesel vehicles first popped on September 18, 2015, when the EPA issued a Notice of Violation of the CAA to Volkswagen and Audi for installing illegal "defeat devices" in 2009–2015 2.0-liter diesel vehicles. A defeat device, as defined by the EPA, is any apparatus or technology that unduly reduces the effectiveness of emission control systems under normal driving conditions. The EPA found that the Volkswagen/Audi defeat device allowed the vehicles to pass emission testing while polluting far in excess of emission standards, revealing the new "clean diesel" technology to be illusory. CARB also announced that it had initiated an enforcement investigation of Volkswagen pertaining to the vehicles at issue in the Notice of Violation. On September 22, 2015, Volkswagen admitted that 11 million diesel cars worldwide were installed with the same defeat device software. Volkswagen wasn't alone—soon after, government agencies began to reveal that other automakers sold dozens of models exceeding allowable emission levels under applicable standards. Nevertheless, the Defendants in this action continued with business as usual, concealing from regulators and consumers their Fraudulent Vehicles' emissions-related behavior and performance.

22

## DEFENDANTS' DIRTY "ECODIESEL®" SCHEME

52.     Federal and state emission standards are in place to protect Americans from pollution and certain chemicals known to cause disease in humans.  Automobile manufacturers must abide by applicable laws and adhere to EPA rules and regulations (and those of CARB in California and 14 other states that have adopted California's standards).  The CAA requires vehicle manufacturers to certify to the EPA that the vehicles sold in the United States meet applicable federal emission standards to control air pollution.  Every vehicle sold in the United States must be covered by an EPA-issued COC, and every vehicle sold in the State of California must be covered by a CARB-issued EO.

53.     There is a very good reason that these laws and regulations exist and apply to vehicles with diesel engines: in 2012, the World Health Organization declared diesel vehicle emissions to be carcinogenic and about as dangerous as asbestos.

54.     Diesel engines pose a unique challenge because they have an inherent trade-off between power, fuel efficiency, and emissions: the greater the power and fuel efficiency, the dirtier and more harmful the emissions.  Instead of using a spark plug to combust highly refined fuel with short hydrocarbon chains, as gasoline engines do, diesel engines compress a mist of liquid fuel and air to very high temperatures and pressures, which causes the fuel/air mixture to combust.  This causes a more powerful compression of the pistons, which can produce greater engine torque (that is, more power).  Diesel engines are able to do this both because they operate at a higher compression ratio than gasoline engines and because diesel fuel contains more energy than gasoline.

55.     But this greater energy and fuel efficiency comes at a cost: diesel produces dirtier and more dangerous emissions.  Diesel combustion produces NOx, a variety of nitrogen and

oxygen chemical compounds that only form at high temperatures. NOx pollution contributes to nitrogen dioxide, particulate matter in the air, and reacts with sunlight in the atmosphere to form ozone. Exposure to these pollutants has been linked with serious health dangers, including asthma attacks and other respiratory illnesses serious enough to send people to the hospital. Ozone and particulate matter exposure have been associated with premature death due to respiratory-related or cardiovascular-related effects. Children, the elderly, and people respiratory illnesses are at acute risk of health effects from these pollutants.

56. Given the risks, minimizing NOx is paramount. But removing these pollutants from untreated exhaust is difficult, and diesel automakers have reacted by trying to remove NOx from the exhaust using catalysts. Modern turbodiesel engines use ceramic diesel filters to trap particulates before they are emitted. Many also use a technology called "selective catalytic reduction" ("SCR") to reduce NOx emissions. SCR systems inject a measured amount of urea solution into the exhaust stream, which breaks oxides of nitrogen down into to less noxious substances before they are emitted. SCR-equipped vehicles must carry an onboard tank of fluid for this purpose, and injection of the fluid is controlled by the same engine control module that manages the fuel-air mixture and other aspects of engine operation.

57. FCA's response to this challenge was the EcoDiesel® engine. Emission reductions start in the cylinder with advanced fuel injection strategies. After the byproducts of combustion leave the engine, the EcoDiesel® technology treats these emissions using a diesel oxidation catalyst, diesel particulate filter, and SCR.

58. The Fraudulent Vehicles use engine management computers to monitor sensors throughout the vehicle and operate nearly all of the vehicle's systems according to sophisticated programming that can sense and vary factors like steering, combustion, and emissions

24

performance for different driving situations. To manage engine and emission controls, the Fraudulent Vehicles use a Bosch EDC system. Bosch GmbH and Bosch LLC designed, tested, customized, manufactured, and sold these EDC systems, including software code, to Fiat Chrysler (along with other automakers including Volkswagen, Mercedes, and General Motors) for use in the Fraudulent Vehicles.

59.    The system used in the Fraudulent Vehicles is Bosch's EDC Unit 17 (also called "EDC17"). A February 28, 2006 Bosch press release introduced the "New Bosch EDC17 engine management system" as the "brain of diesel injection" which "controls every parameter that is important for effective, low-emission combustion." The EDC17 offered "[e]ffective control of combustion" and a "[c]oncept tailored for all vehicle classes and markets." In the press release, Bosch touted the EDC17 as follows:

> **EDC17: Ready for future demands**
> Because the computing power and functional scope of the new EDC17 can be adapted to match particular requirements, it can be used very flexibly in any vehicle segment on all the world's markets. In addition to controlling the precise timing and quantity of injection, exhaust gas recirculation, and manifold pressure regulation, it also offers a large number of options such as the control of particulate filters or systems for reducing nitrogen oxides. The Bosch EDC17 determines the injection parameters for each cylinder, making specific adaptations if necessary. This improves the precision of injection throughout the vehicle's entire service life. The system therefore makes an important contribution to observing future exhaust gas emission limits.

60.    Bosch's EDC Unit 17 controls emissions by periodically reading sensor values, evaluating a control function, and controlling actuators based on the control signal. Sensor readings include crankshaft position, air pressure, air temperature, air mass, fuel temperature, oil temperature, coolant temperature, vehicle speed, exhaust oxygen content, as well as driver inputs such as accelerator pedal position, brake pedal position, cruise control setting, and selected gear. Based on sensor input, EDC17 controls and influences the fuel combustion process including, in particular, fuel injection timing, which affects engine power, fuel consumption, and the

composition of the exhaust gas.

61.    As Ram Trucks' Chief Engineer said at the time, "We were fortunate at this point in time that our partners at Fiat owned half of VM Motori, who makes this diesel engine. . . .We combined resources and developed them together."

62.    According to its website, VM Motori is deeply involved in the development and testing of all aspects of the engine: "We take care of the engines and their applications, working together with the Customers to the least detail to ensure a perfect matching between the engine and the machine, supporting our partners from A to Z, from engine- to-machine coupling up to the production."

63.    In fact, VM Motori boasts of its involvement in: "Calibration development to meet specific vehicle/end user requirements, Exhaust after-treatment system development, [and] Environmental trips (hot/cold climate, high altitude, etc.)."    VM Motori also notes that its facilities include: "Rolling dyno for vehicle emission measurement [and] engine test benches for emission/performance development."

64.    The engine originally was developed for use in Europe, where standards for emission of oxides of nitrogen from diesel vehicles are less stringent than in the United States. Rather than make the engine compliant with U.S. emissions standards, FCA opted to cheat on the emission test.

65.    In January 2013, Bosch LLC announced that its "clean diesel" technology, including the EDC Unit 17, would be featured in the new 2014 Jeep Grand Cherokee 3.0-Liter EcoDiesel®.    As part of that announcement, Bosch LLC stated: "The 2014 Jeep Grand Cherokee features a Bosch emission system compliant with the most stringent emission regulations in the world.  From fuel tank to tailpipe, Bosch is pleased to equip this vehicle with

26

top technologies to give consumers a great driving experience requiring fewer stops at the pump." Bosch LLC also announced that the "clean diesel" system for the Jeep Grand Cherokee would be assembled at Bosch's facility in Kentwood, Michigan.

66.     In reality, Fiat Chrysler—working with VM Italy and VM America on the design of the EcoDiesel®'s engines and Bosch GmbH and Bosch LLC on the design of the EDC Unit 17—was either unable or unwilling to devise a solution within the constraints of the law. And so, like their rivals at Volkswagen, they devised one outside of it. Instead of cutting their losses on "EcoDiesel," delaying the production of the Fraudulent Vehicles, or coming clean, Fiat Chrysler worked closely with VM Italy and VM America and Bosch GmbH and Bosch LLC to customize the EDC Unit 17 to allow Fraudulent Vehicles to simulate "passing" the EPA and CARB testing. Unlike during testing, the software disables or restricts certain of the emission controls during real-world driving conditions. When the emission controls are de-activated on the road, the Fraudulent Vehicles emit up to 20 times the legal limits of NOx.

67.     These software controls designed and implemented by Bosch GmbH and Bosch LLC were concealed from regulators on COC and EO applications for the Fraudulent Vehicles, thus deceiving the EPA and CARB into approving the Fraudulent Vehicles for sale throughout the United States and California. Of course, consumers, who have no way of discerning that the emission control technology de-activated during real-world driving conditions, were likewise deceived.

68.     Specifically, Bosch GmbH and Bosch LLC worked hand-in-glove with Fiat Chrysler and VM Motori to develop and implement a specific set of software algorithms for implementation in the Fraudulent Vehicles, which enabled FCA to adjust fuel levels, exhaust gas recirculation, air pressure levels, and even urea injection rates. A study recently published by

researchers at the University of California, San Diego, and Ruhr-Universität Bochum in Germany revealed technical documents showing that Bosch code was used in a so-called defeat device for a Fiat vehicle. The study described the software as setting one mode for when a vehicle is being tested for emissions, but then allowing tailpipe pollution to spike in real-world driving conditions. The study described Bosch's role in building the electronic control unit ("ECU") hardware and developing the software running on the ECU and found there was "no evidence that automobile manufacturers write any of the code running on the ECU." To the contrary: "All code we analyzed in this work was documented in documents copyrighted by Bosch and identified automakers as the intended customers." The study concluded: "We find strong evidence that both defeat devices were created by Bosch and then enabled by Volkswagen and Fiat for their respective vehicles."

69.     For context, when carmakers test their vehicles against EPA emission standards, they place their cars on dynamometers (essentially large treadmills or "rollers") and then perform a series of specific maneuvers prescribed by federal regulations to simulate driving and test emissions in a controlled environment. Bosch's EDC Unit 17 gave Fiat Chrysler the ability to detect test scenarios by monitoring vehicle speed, acceleration, engine operation, air pressure, and even the position of the steering wheel. For example, given that the steering wheel cannot be turned on a dynamometer, Bosch programmed a sensor which detected whether or not the steering wheel turned. When the EDC Unit 17's detection algorithm detected an emission test was complete, the EDC Unit 17 could de-activate or reduce the emission control systems' performance, causing the Fraudulent Vehicle to spew illegal amounts of NOx emissions when out on the road.

70.     This workaround was illegal. The CAA expressly prohibits defeat devices,

defined as any auxiliary emission control device "that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use." 40 C.F.R. § 86.1803-01; *see also id.* § 86.1809-10 ("No new light-duty vehicle, light-duty truck, medium-duty passenger vehicle, or complete heavy-duty vehicle shall be equipped with a defeat device."). Moreover, the CAA prohibits the sale of components used as defeat devices, "where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use." 42 U.S.C. § 7522(a)(3). Finally, in order to obtain a COC, automakers must submit an application, which lists all auxiliary emission control devices installed in the vehicle, a justification for each, and an explanation of why the control device is not a defeat device.

71.    As the EPA has now alleged against Fiat, FCA, VM Italy, and VM America, Defendants did not disclose, and affirmatively concealed, the presence of performance-altering software code developed with Bosch GmbH and Bosch LLC from government regulators. In other words, FCA lied to the government, its customers, its dealers, and the public at large.

72.    Because FCA lied on the COC and EO applications, these COCs and EOs were fraudulently obtained. And because the Fraudulent Vehicles did not conform "in all material respects" to the specifications provided in the COC and EO applications, the Fraudulent Vehicles were never covered by a valid COC or EO, and thus were *never* legal for sale—nor were they EPA and/or CARB compliant, as represented. With the complicity of Bosch and VM Motori, Fiat Chrysler hid these facts from the EPA, CARB, and other regulators, from FCA dealers and consumers, and FCA continued to sell and lease the Fraudulent Vehicles to the driving public, despite their illegality.

73.    Fiat Chrysler's illegal workaround was enabled by a close partnership with

Bosch, which enjoyed a sizable portion of its annual revenue from manufacturing parts used in the Fraudulent Vehicles and other "clean" diesel vehicles. Bosch GmbH and Bosch LLC were aware that Fiat Chrysler used its emission control technology as a concealed auxiliary (or defeat) device and, in act, worked together with Fiat Chrysler and VM Motori to develop and implement software algorithms specifically tailored to allow the Fraudulent Vehicles to evade detection.

74.     Bosch GmbH and Bosch LLC worked closely with Fiat Chrysler and VM Motori to create specifications and software code for each Fraudulent Vehicle model. Indeed, customizing a road-ready ECU is an intensive three- to five-year endeavor involving a full-time Bosch presence at an automaker's facility. VM Italy and VM America likewise worked closely with Bosch GmbH, Bosch LLC, and Fiat Chrysler in designing, installing, and calibrating the engines for the Fraudulent Vehicles.

75.     All Bosch EDCs, including the EDC17, run on complex, highly proprietary engine management software over which Bosch exerts near-total control. In fact, the software is typically locked to prevent customers, like Fiat Chrysler, from making significant changes on their own. Accordingly, both the design and implementation are interactive processes, requiring Bosch's close collaboration with the automaker from beginning to end.

76.     Bosch GmbH and Bosch LLC's security measures further confirm that its customers cannot make significant changes to Bosch software without their involvement. Bosch boasts that its security modules protect vehicle systems against unauthorized access in every operating phase, meaning that no alteration could have been made without either a breach of that security—and no such claims have been advanced—or Bosch's knowing participation.

77.     Unsurprisingly, then, at least one car company engineer has confirmed that Bosch maintains absolute control over its software as part of its regular business practices:

> I've had many arguments with Bosch, and they certainly own the
> dataset software and let their customers tune the curves. Before each
> dataset is released it goes back to Bosch for its own validation.

Bosch is involved in all the development we ever do. They insist on being present at all our physical tests and they log all their own data, so someone somewhere at Bosch will have known what was going on. All software routines have to go through the software verification of Bosch, and they have hundreds of milestones of verification, that's the structure ....

The car company is *never* entitled by Bosch to do something on their own.

78.     Defendants' work on the EDC17 reflected a highly unusual degree of coordination among them. As they did with Volkswagen, the units required the work of numerous Bosch coders for a period of more than ten years. Although Bosch publicly introduced the EDC17 in 2006, it had started to develop the engine management system years before.

79.     Bosch was concerned about getting caught in the scheme to enable diesel emissions cheating. As reported in the German newspaper, *Bild am Sonntag*, and a French publication, a Volkswagen internal inquiry found that in 2007, Bosch warned Volkswagen by letter that using the emission-altering software in production vehicles would constitute an "offense." Yet, Bosch concealed the software, and its emission control functions, in various "clean" diesel vehicles, including the Fraudulent Vehicles, from U.S. regulators and consumers.

80.     Bosch LLC worked closely with Bosch GmbH and diesel automakers both in the United States and in Germany, to ensure that the "clean" diesels, like the Fraudulent Vehicles, passed emission testing. Bosch LLC employees frequently communicated with regulators in the United States and actively worked to ensure that diesel vehicles were approved for sale in the United States. For example, we now know that employees of Bosch LLC and Bosch GmbH provided specific information to regulators in the United States about how Volkswagen's

vehicles functioned and unambiguously stated that the vehicles met emission standards. Bosch LLC regularly communicated to its colleagues and clients in Germany about ways to deflect and diffuse questions from regulators in the United States about those vehicles. On information and belief, Bosch LLC also assisted in concealing the true nature of the emission control technology from regulators in the United States with respect to the Fraudulent Vehicles at issue here.

81.    Bosch not only kept the dirty secret safe, it went a step further and actively lobbied lawmakers to push "clean diesel" in the United States. As early as 2004, Bosch announced a push to convince U.S. automakers that its diesel technology could meet tougher 2007 emission standards in the United States. Bosch engaged in a multi-year, multi-million dollar effort involving key players from Bosch in both Germany and the United States. In its efforts to promote "clean diesel" technology in the United States, Bosch GmbH acted on behalf of its global group of affiliated companies, including Bosch LLC.

82.    Bosch's promotion of diesel technology specifically targeted the United States. For example, Bosch put on "Diesel Days in California" and "SAE World Congress in Detroit." In 2008, Bosch LLC co-sponsored the "Future Motion Made in Germany-Second Symposium on Modern Drive Technologies" at the German Embassy in Alabama, D.C., with the aim of providing a venue for "stakeholders to gain insight into the latest technology trends, and to engage in a vital dialogue with industry leaders and policymakers."

83.    Bosch LLC hosted multi-day conferences open to regulators and legislators and held private meetings with regulators, in which it proclaimed extensive knowledge of the "clean" diesel technology, including the calibrations necessary for the vehicles to comply with emission regulations.

84.    In April 2009, for example, Bosch organized and hosted a two-day "California

Diesel Days" event in Sacramento, California.  Bosch invited a roster of lawmakers, journalists, executives, regulators, and non-governmental organizations with the aim of changing perceptions of diesel from "dirty" to "clean."  The event featured "clean diesel" vehicles as ambassadors of "clean diesel" technology.  The stated goals were to "build support for light-duty diesel as a viable solution for achieving California's petroleum and emission reduction objectives."

85.     Bosch also joined in events promoting the Fraudulent Vehicles.  At one such event hosted by Ram, Jeep and Bosch in Traverse City, Michigan, Bosch made a number of statements regarding the 3.0-liter EcoDiesel V6's performance.  It stated that the "Bosch emissions control  system helps ensure that virtually no particulates and minimal oxides of nitrogen (NOx) exit the tailpipe" and that a Jeep Grand Cherokee or Ram 1500 diesel's engine provides a fuel economy that is "30% better than a comparable gasoline engine."

86.     In 2009, Bosch also became a founding member of the U.S. Coalition for Advanced Diesel Cars.  One of this advocacy group's purposes included "promoting the energy efficiency and environmental benefits of advanced clean diesel technology for passenger vehicles in the U.S. marketplace."   This group lobbies Congress, U.S. regulators, and CARB in connection with rules affecting "clean diesel" technology.

## FCA'S MISLEADING MARKETING

### A.  Fiat Chrysler Identifies and Combats the "Dirty Diesel" Stigma.

87.     As described above, Fiat Chrysler, VM Motori, and Bosch began investigating strategies to develop and market diesel vehicles in the North American market in at least July 2010.  FCA-MDL-001184465.  As early as February 2012, Chrysler had already commissioned and presented research to understand how to market the diesel vehicles to consumers.  FCA-

MDL-001182796-821.

88.    This research confirmed that the Defendants had a significant obstacle to overcome: consumers associated diesel engines with old technology and, more importantly, with "negative images of smog and dirt."

89.    This "dirty diesel" stigma was considerable. During Fiat Chrysler's 2012 focus group addressing "diesel perceptions," one consumer noted "[I] can't stand diesel"; another felt "[diesel] has an image problem"; another explained that "when somebody says diesel, I just think of that black smoke"; to another, diesel evoked image of "smoke, exhaust"; another associated diesel with "old images of a truck letting off all of these emissions"; and, summing it up, one focus group participant noted "you just think dirty when you think diesel." FCA-MDL-001422127.

90.    Unsurprisingly, then, Fiat Chrysler worked hard to rebut the dirty diesel stigma in communications directly with consumers and in training materials for dealers (to help the dealers persuade consumers to purchase the Fraudulent Vehicles). In a Jeep EcoDiesel "Product Brief," for example, Fiat Chrysler noted "[b]uyers can be resistant to consider a diesel purchase due to several perceptions that are no longer true" including that "diesels are filthy . . . [and] too loud and smelly." FCA-MDL-000517246-53. The brief combats these perceptions by stating that "diesel engines are surprisingly responsible in view of ecological concerns." *Id.* It also includes a "key messages" for prospective consumers including: "Diesel engines offer clean operation with typically 25% less emissions than a gasoline engine." *Id.* It also notes that the "3.0L EcoDiesel V6 uses Selective Catalyst Reduction (SCR) with DEF to help minimize exhaust emissions" and uses "NOx modules and sensors . . . to help control tailpipe emissions." *Id.*

34

91.    Similarly, a Ram 1500 "Targeted In-Dealership Training" guide notes that the two "most common misconceptions about diesel engines" are that "Diesels are noisy" and "Diesels are dirty." FCA-MDL-000517194-203. As to the latter, the guide instructs dealers that the "Diesel Exhaust Fluid (DEF) and Selective Catalyst Reduction lower the exhaust emissions of diesel engines." *Id.* It later explains that DEF "reduce[s] nitrous oxides coming out of the tailpipe" and "helps to create non-harmful emissions." *Id.* The guide then states that "[o]ur EcoDiesel runs extremely clean for a truck powerplant." *Id.*

92.    In a "news" document, again presumably targeting Ram and Jeep dealers, Fiat Chrysler explained that "[w]hen pitching the EcoDiesel, it may help you to keep in mind a few advantages to driving a diesel engine." FCA-MDL-000518525. One advantage was that "Diesels Are Getting Greener." *Id.* The document then explained that "[i]n the past, diesels were seen as polluters – a hindrance to environmentally conscious customers. Today's diesels, however, run cleaner than they ever have before. For its part, the ecologically responsible EcoDiesel V6 is the cleanest light-duty engine available." *Id.*

## B. The EcoDiesel Name and Badge Communicate Environmental Friendliness and Fuel Efficiency.

93.    Fiat Chrysler also understood that a key component of overcoming the diesel stigma, and of marketing the Fraudulent Vehicles' purported environmental friendliness and fuel economy, was the naming and labeling of the diesel technology. As noted above, Fiat Chrysler conducted research in February 2012 to address this very issue. FCA-MDL-001182796-821. That research concluded that the "[b]est names [for Fiat Chrysler's diesel engine] highlight 'green' theme." *Id.* It further concluded that "[f]uel efficiency and environmental friendliness are important; names connected with these will be most well-received." *Id.*

94.    The highest-ranked name, in terms of both appeal and preference, was "Eco-

35

Diesel." The research explained that "'Eco' encompasses green, efficient, and economic . . . and is strongly associated with being environmentally friendly." Similarly, the research concluded that the EcoDiesel "[n]ame [i]mplies a variety of positive meanings – green, efficient, economic, etc." Unsurprisingly, the "imagery" most associated with the name "EcoDiesel" was "Environmentally-Friendly" and "Fuel Efficient." *Id.*

95.     Although other potential names (*e.g.*, "Clean Diesel" and "Enviro Diesel") had slightly higher associations with environmental friendliness, "EcoDiesel" communicated the combination of "green" credentials and fuel economy the best. Fiat Chrysler had found its winner.

96.     Fiat Chrysler adopted and trademarked the "EcoDiesel" name and used it in virtually every advertisement for the Fraudulent Vehicles. It also branded every single Fraudulent Vehicle with an EcoDiesel badge.

97.     This badging was extremely important to Fiat Chrysler. Jim Morrison, then the head of Jeep Brand Product marketing, gave a presentation some 20-30 times in which he explained that "consumers are immediately receptive to the EcoDiesel badging/logo" and "suggest that 'Eco-diesel badging can initially change the impression of diesel vehicles." FCA-MDL-001166458-533; Morrison Dep. Tr. 131:5-6. As the notes below the slide confirm, "[c]onsumers further believe that the word 'Eco- Diesel' can change the perception of a diesel engine to something denoting ecologically conscious and economical to own and operate." *Id.*

98.     Mr. Morrison also confirmed the meaning and importance of the EcoDiesel name and badge in a sworn declaration he submitted in connection with a trademark dispute. There, he declared that "Chrysler decided to combine the terms 'Eco,' 'Diesel,' and '3.0L' . . . to refer to the engine because the engine is an economical, fuel-efficient, more environmentally friendly

3.0 liter diesel engine." *Unitek Solvent Services, Inc. v. Chrysler Group*, LLC, No. 1:12-cv-00794, Dkt. 86-35 at ¶ 8 (June 4, 2013). He further explained that "Chrysler [also] based its decision to use the descriptive terms 'eco' and 'ecodiesel' on the fact that numerous third parties in a variety of industries use the term 'eco' to describe ecologically or environmentally friendly products or services that have been developed to reduce carbon emission, energy consumption, or otherwise preserver the environment." *Id.* at ¶ 10.

99.     Many additional documents confirm that Fiat Chrysler intended the name "EcoDiesel" and the EcoDiesel badge to convey both environmental friendliness and fuel economy. A September 2013 press release, for example, included a heading entitled "Putting the 'Eco' in EcoDiesel" under which it claimed that "[t]he new EcoDiesel V6 achieves 50-state emissions compliance for both tier II and BIN 5." FCA-MDL-000519022-24. In other words, the "Eco" in EcoDiesel means not just environmental friendliness, generally, but also emissions compliance, specifically.

100.     A later Ram press release entitled "Ram has 'turned up the ECO' on fullsize truck MPGs . . . to 29" further demonstrates that the "Eco" in EcoDiesel also refers to fuel economy. FCA-MDL-001344885-86; FCA-MDL-001401873.

101.     Again, the EcoDiesel badge was placed prominently on every single Fraudulent Vehicle, and the word "EcoDiesel" was used in virtually every consumer-facing communication. That word and badge represented to consumers and Plaintiffs that the Fraudulent Vehicles were environmentally friendly and fuel efficient. Both representations, it turns out, were based on a lie: the Fraudulent Vehicles were not, in fact, environmentally friendly, and could achieve their fuel economy only through concealed emissions apparatuses that caused the vehicles to pollute excessively in real- world driving conditions. Each Plaintiff saw and relied on the "EcoDiesel"

badge and acquired a Fraudulent Vehicle based on the representation that it was an "Ecodiesel" vehicle (i.e. reduced emissions and fuel efficient).

### C. FCA Misrepresents the Fraudulent Vehicles to Consumers in a Consistent and Pervasive Marketing Campaign.

102.    Fiat Chrysler's misleading representations about the Fraudulent Vehicles— including their purported "green" credentials, superior fuel economy, and other performance characteristics—were not limited to EcoDiesel badge. Indeed, FCA engaged in a full court press to market the Fraudulent Vehicles, and to communicate to consumers the purported benefits of the EcoDiesel engine. These communication efforts included, among other things: (1) press releases aimed at generating positive news articles about the EcoDiesel attributes; (2) comprehensive dealer training materials that taught dealers how to sell the Fraudulent Vehicles with false and misleading misrepresentations; (3) vehicle brochures disseminated at dealerships and elsewhere; information and interactive features on FCA's websites and blogs; and (4) print and television marketing.

#### 1.    Press Releases and Media Communications

103.    As early as 2013, FCA began issuing press releases that were sent directly to consumers and were also intended to generate consumer-facing articles and reviews about the EcoDiesel engine. There are many such examples. A representative sampling includes:

a.    A January 2013 press release announcing a "new, clean, 3.0-iter EcoDiesel V-6 engine" in the Jeep Grand Cherokee. The release touts the "30 mpg highway with driving range of more than 730 miles," and the "class- leading 240 horsepower and massive 420lb.-ft of torque." Notably, it also states that the "Selective Catalytic Reduction (SCR) help[s] the new engine" be "clean" and "50-state legal." FCA-MDL-001134988-90.

b.    An October 2013 press release notifying the media that the "[n]ew 2014 Jeep Grand Cherokee EcoDiesel wins 'Green' category" of the 2014 Active Lifestyle Vehicle Awards. The release claims the Jeep EcoDiesel includes "clean-diesel technology" and delivers "best-in-class fuel economy and driving range." FCA-

MDL-000519206-07.

    c.    A February 2014 press release proclaiming that the "2014 Ram 1500 EcoDiesel sets new fuel-economy benchmark of 28 MPG." The release repeatedly touts the EcoDiesel's fuel economy and claims that its SCR and EGR systems—both of which were compromised by the AECDs described herein—"contribute to 50-state compliance with Tier2/Bin 5 emissions regulations." FCA-MDL-001142520-21.

    d.    A November 2014 press release announcing that the "Ram 1500 EcoDiesel [was] named 2015 Green Truck of the Year by Green Car Journal." The release states that the "Ram 1500 delivers an outstanding combination of best-in-class fuel efficiency, unsurpassed torque and a surplus of towing capacity." It also quotes the editor of Green Car Journal who noted that "[t]he Ram 1500 EcoDiesel exemplifies what a 'green' truck should be." FCA-MDL-000519290-01.

    e.    A January 2015 press release announcing that the "Jeep Grand Cherokee EcoDiesel [was] named 2015 Green SUV of the Year by Green Car Journal." The release again boasts the EcoDiesel's "best-in-class" fuel economy, "untouched" range, "class-leading" horsepower, "massive" torque, and its "clean-diesel technology." FCA-MDL-001377187-88.

    f.    A November 2016 press release boasting "best-in-class fuel economy and longest range with exclusive EcoDiesel – 29 mpg and 754 miles with Ram 1500." FCA-MDL-001185732-34.

104.    Notably, Marchionne himself was asked to approve, and did approve, a draft press release from February 2013 announcing that "Ram [was the] first to build light-duty diesel pickup." The release promoted an "outstanding combination of best-in-class fuel efficiency, best- in-class torque and impressive capability." It also stated that the "EcoDiesel . . . emissions are 60  percent less than those produced by diesel powertrains 25 years ago." FCA-MDL-001367858-59.

105.    In some instances, these press releases were sent directly to consumers in "hand raiser" communications, as evidenced by a 2014 email to a prospective customer. That email "thanks [the prospective customer] for asking about the 2014 Ram 1500 EcoDiesel,"—which it says is "capable, efficient, and easy on the environment"—and links to a Ram "press release for

more information." FCA-MDL-001180641.

106.    Even when not sent directly to consumers, all the press releases—and the consistent representations about environmental friendliness, fuel economy, and performance contained in them—were intended to, and did in fact, result in significant buzz and media attention for the EcoDiesel vehicles, to which Plaintiffs were exposed. The representations that resulted were false (because the vehicles contained concealed components that compromised the emissions control systems in real-world driving conditions) and deceptive (because the vehicles could not perform as represented without the concealed emission control components).

### 2. Dealer Training Materials

107.    As noted above, FCA disseminated to its dealers comprehensive training materials to help them communicate the EcoDiesel attributes to consumers, and ultimately, to sell more Fraudulent Vehicles. Those materials consistently emphasized the (supposed) environmental friendliness, fuel efficiency, and power of the EcoDiesel engine, among other attributes.

108.    Ram, for example, held a "targeted in-dealership training" through its dealer-focused "Chrysler Academy" and disseminated an accompanying "participant reference guide." The document explains that the training is "focuse[d] on features of Ram 1500 and will help you sell down your 2014 model year vehicles while it also helps you prepare for the 2015s." This training document includes an entire section on EcoDiesel, and as discussed above, it addresses the "common misconception" that "[d]iesels are dirty" and instructs that "Diesel Exhaust Fluid (DEF) and Selective Catalyst Reduction lower the exhaust emissions of diesel engines." Then, answering the question "How clean is the 3.0L EcoDiesel V6?" the guide explains that "[o]ur EcoDiesel runs extremely clean." It also states that the engine "[c]omplies with all diesel-related

emissions standards," and notes that selling points of the diesel include its "Fuel efficiency," "Power (Torque)," and "Quality, Reliability and Durability (QRD)." Finally, the guide includes an "in the media section" highlighting positive reviews and articles. FCA-MDL-000517194-245.

109.    Jeep held a similar Chrysler Academy event for dealers and also disseminated an accompanying "product reference guide" with eight pages devoted exclusively to the EcoDiesel engine. FCA-MDL-000518573-620. As with the Ram guide, the Jeep guide addresses the dirty diesel stigma, and offers selling points to rebut it. The guide explains that the EcoDiesel engine exhibits "confident power, surprisingly clean operation" and claims that "it is going to convert a host of new customers to the impressive benefits of pulse-quickening acceleration and efficient and ecological clean diesel operation." It highlights the "clean operation and effective emissions control," specifically noting that the SCR and EGR systems combine to mitigate NOx and produce "clean diesel operation." Finally it includes a "Key messages" section emphasizing the importance of fuel efficiency, "clean operation," and "torque." These themes are echoed almost verbatim in another, 13-page Chrysler Academy "Product Brief" focused exclusively on the EcoDiesel engine. FCA-MDL-001183753-65. The product brief includes almost identical "key messages for your prospects," and notes that the engine is "surprisingly responsible in view of ecological concerns."

110.    Yet another Chrysler Academy "Web Launch" training session explains that its purpose was "to help participants" better understand the vehicles and, critically, to "[u]nderstand elements for effective presentations to shoppers." It includes similar language about fuel economy, power, and environmental friendliness. It also explains that "for buyers who respect the environment, they should know this is a very clean diesel . . . very green without question."

FCA-MDL-001183766-901.

111.    These are but a few examples that highlight the comprehensive training that FCA provided for its dealers.  The objective of these trainings was to arm the dealers with selling points that they could relay to consumers—and they did just that.  For the Fraudulent Vehicles, the consistent selling point was the no-compromise combination of fuel efficiency, environmental friendliness, and power.  This selling point was false (because the vehicles contained concealed components that compromised the emissions control systems in real-world driving conditions) and deceptive (because the vehicles could not perform as represented without the concealed emission control components).

### 3.  Vehicle Brochures

112.    FCA also communicated directly with consumers through its vehicle brochures, available both online and at the dealerships.  These brochures are chock full of representations about the EcoDiesel engine's fuel economy, environmental friendliness, and power.

113.    The brochure for the 2014 Jeep Grand Cherokee, for example, devotes an entire page to the EcoDiesel engine.  That page depicts the EcoDiesel badge and also an image of the engine with a green leaf on top.  It states that the engine achieves "best-in class: 30 MPG fuel economy[,] 730-mile driving range[,] 420 lb-ft of torque[, and] 7400-lb maximum towing."  It further claims that "its reduced CO2 emissions display reverence for the environment" and even goes so far as to state that "[p]roudly, the EcoDiesel meets and even exceeds the low emissions requirements in all 50 states."

114.    The 2015 brochure makes similar claims.  It again features the EcoDiesel badge and environmental imagery.  And it again boasts "best-in-class . . . 30 hwy mpg fuel economy" and "a driving range of 730 highway miles."  It also states that the vehicles are "clean" and 50-

state compliant, and even opens with this environmentally-focused introduction: "Love the planet along with great fuel economy? Then the Jeep Brand's Diesel engine will ring true. It lets you adhere to your principles and get extra points for embracing innovative technology."

115. The 2016 brochure also features the EcoDiesel badge, and touts best-in-class fuel economy, range, horsepower, and torque. And it too states that "[t]he EcoDiesel exceeds the low- emissions requirements in all 50-states."

116. The Ram 1500 brochures make similar claims. Like the Jeep Brochures, the 2014 Ram 1500 brochure devotes an entire page to the EcoDiesel engine, depicts the EcoDiesel badge, and repeatedly touts the truck's "best-in-class" fuel economy and "impressive" range. It also boasts that the truck is "clean by nature" with "minimal $CO_2$ levels" and a "[t]op-notch DEF system."

117. The 2015 brochure also advertises "top-tier mpg ratings," "superb driving range and best-in-class 28 mpg highway," and claims the truck is "clean by nature" with "minimal $CO_2$ levels" and a "zero-hassle DEF system."

118. The 2016 brochure again boasts "best-in-class 29 mpg highway fuel economy," "up to 754-mile range," "240 horsepower," "420 lb-ft of torque," "minimal $CO_2$ levels" and a "zero-hassle DEF system."

119. The brochures are tied together by common themes and sometimes identical language. The key representations made throughout were that the Fraudulent Vehicles delivered a no-compromise combination of fuel efficiency, environmental friendliness, and performance. Those representations were false (because the vehicles contained concealed components that compromised the emissions control systems in real-world driving conditions) and deceptive (because the vehicles could not perform as represented without the concealed emission control

components).

### 4. FCA Websites

120.    FCA hosted a number of blogs and websites that promoted the EcoDiesel technology, including the official Ram and Jeep websites, which many named Plaintiffs visited before making their purchase/lease decisions. Both company sites reiterated FCA's consistent messaging for the Fraudulent Vehicles—*i.e.*, that they were clean, fuel efficient, and high performing.

121.    A February 9, 2014, capture of the Jeep website, for example, includes a diesel tab, under which it displays the EcoDiesel badge and tells viewers to "[f]orget everything you thought you knew about diesel. The all-new jeep EcoDiesel engine offers innovative technology that is efficient, increases range, and improves power – all while leaving little trace of being there."

122.    The Jeep website also includes separate pages featuring its supposed "Best-in-Class maximum towing capacity," "incredible 730-mile highway driving range," and "superior fuel economy." As to fuel economy, the website also includes (and has included since at least 2014) a "savings calculator" that allows consumers to enter their miles driven per day and then calculates their annual fuel savings using "Clean Diesel."

123.    Ram's website made similar representations, touting the fuel economy, horsepower, torque, and towing capacity of the EcoDiesel engine, and claiming that it was "[e]quipped with a diesel oxidation catalyst, diesel particulate filter and selective catalyst reduction so it is emissions-compliant in all 50-states."

124.    Like Jeep, Ram also included a fuel savings calculator, as well as graphics comparing the best-in-class fuel economy to the competition.

125.    FCA made many similar representations throughout the many websites it operated, including but not limited to the following:

a.    The EcoDiesel engine is designed for those "who want to drive an efficient, environmentally friendly truck without sacrificing capability or performance."

b.    The Ram 1500 EcoDiesel is "the NAFTA market's first and only light-duty pickup powered by clean diesel technology."

c.    "Thanks to advanced emissions-control technology . . [EcoDiesel's] exhaust is ultra-clean, making this engine available in all 50 states."

d.    "Equipped with a diesel oxidation catalyst, diesel particulate filter and selective catalyst reduction, the EcoDiesel® V6 engine will be emissions- compliant in all 50 states."

e.    "Chrysler Group engineers adapted the engine—manufactured by Fiat- owned V.M. Motori—to meet the NAFTA region's stringent emissions and on-board diagnostic regulations. The new EcoDiesel® V-6 is Tier 2/Bin 5 compliant."

f.    The emissions on the EcoDiesel® engine data sheet meet Tier2 Bin5 requirements.

g.    "[T]he Bosch emissions control system helps ensure that virtually no particulates and minimal oxides of nitrogen (NOx) exit the tailpipe."

126.    Many Plaintiffs visited FCA's websites to learn about the Fraudulent Vehicles. On those websites, as in all the other ways FCA communicated to consumers, FCA's message was clear and consistent: the EcoDiesel engine delivers a no-compromise package of fuel economy, range, performance, and environmental-friendliness. Those representations were false (because the vehicles contained concealed components that compromised the emissions control systems in real-world driving conditions) and deceptive (because the vehicles could not perform as represented without the concealed emission control components).

### 5.  Print Media and Television

127.    FCA reiterated its consistent representations - particularly the fuel economy representations - through print media and television commercials.

128.    The print ad campaign was robust. One FCA-produced document identifies over

250 Ram print ad buys in several dozen publications from June 2014 to October 2016. FCA-

MDL-000519349. Another document shows expenditures of almost $300,000 to place Jeep

EcoDiesel print ads in a variety of magazines in June through August 2013. FCA-MDL-

001360559. Yet another document identifies additional ad buys for 14 newspapers across the

country. FCA-MDL-000519351. And Plaintiffs' own investigation has revealed even more

print ad placements in additional publications.

129.    Critically, virtually all of the print ads for the Fraudulent Vehicles contain the

same or similar relevant representations, including: (1) the word "EcoDiesel" and/or the

EcoDiesel badge, and (2) fuel economy claims such as specific MPG ratings, "most fuel

efficient," and "best-in- class" fuel economy.

130.    The television commercial campaign was also extensive, and also conveyed

consistent messages. One FCA document shows 17,595 discrete commercial buys between

January 2014 and September 2016, including during prominent and widely-viewed programing.

FCA-MDL-000519350.

131.    Some examples of the relevant commercials (a portion of which are not included

in the chart described above) include:

a.    A commercial entitled "West" that prominently features the EcoDiesel badge,
and promotes the Ram 1500 EcoDiesel's "28 highway MPG" and "9,200 lbs
towing." FCA-MDL-000512961.

b.    A commercial entitled "Roar" that prominently features the EcoDiesel badge, and
promotes the Ram 1500 EcoDiesel's "28 highway MPG" and "420 lb-ft torque."
FCA-MDL-000512962.

c.    A commercial entitled "Runaway" that prominently features the EcoDiesel badge
and promotes the Jeep Grand Cherokee EcoDiesel's "best-in-class 30 MPG hwy"
and "730-mile driving range." FCA-MDL-000518756. Per the commercial buy
document described above, this commercial ran approximately 1,000 times in

46

January 2014.

d.    A commercial entitled "Take Every Mile" that features the EcoDiesel badge and promotes the Jeep Grand Cherokee EcoDiesel's "730-mile driving range." FCA-MDL-000518759. Per the commercial buy document described above, this commercial ran approximately 400 times in two weeks in February 2016.

e.    A commercial entitled "The Truth About Diesel" that "bust[s] some myths about diesel engines," including that "all SUVs get bad gas mileage, diesel engines are dirty, and they run sluggish." All three myths were "totally busted," and the video specifically boasts the Jeep Grand Cherokee EcoDiesel's "30 MPG and a 730-mile driving range." It also depicts a man "check[ing] the data" on the emissions from the tailpipe and remarking "Wow, the greenhouse gas emissions are lower than a regular gasoline engine." FCA-MDL-001418576.

132.    Like the rest of Fiat Chrysler's consumer communications, these commercials represented that the Fraudulent Vehicles were green (both through explicit representations and depictions of the EcoDiesel name and badge) and fuel efficient. These representations were pervasive and consistent. They were also false (because the vehicles contained concealed components that compromised the emissions control systems in real-world driving conditions) and deceptive (because the vehicles could not perform as represented without the concealed emission control components).

133.    The Defendants saw the EcoDiesel technology as a huge opportunity to increase their sales and profits. They understood that to realize this goal, they would have to overcome the "dirty diesel" stigma, and convince consumers that the Fraudulent Vehicles offered a no-compromise package of fuel efficiency, environmental friendliness, and power. Fiat Chrysler's efforts to communicate this message to consumers were far reaching and consistent. They were also false and deceptive.

134.    Defendants had multiple opportunities, and obligations, throughout their marketing communications to disclose the uniform truth about the Fraudulent Vehicles—namely, that all their emissions, fuel economy, and performance claims were predicated on

concealed emissions control components and software that caused the Fraudulent Vehicles to pollute excessively in real- world driving conditions. This uniform omission and unvarying concealment prevented any and all consumers from making a purchase based on all material facts.

### D. The Defendants Knew These Representations Were False and Misleading.

135.    Unfortunately, the EcoDiesel technology did not work as represented. In developing the Fraudulent Vehicles, the Defendants came to understand that they could not make the vehicles environmentally friendly or "50-state compliant"—as they represented to consumers through consistent and pervasive communications—and that the vehicles could not achieve the fuel economy and performance that were central to Fiat Chrysler's marketing efforts without installing components and software that de-activated or reduced the emission control system during real-world driving conditions. The Defendants concealed this fact from the regulators and consumers alike, and cheated Plaintiffs of the vehicles they thought they were buying.

136.    The Defendants' scheme focused on at least two of the emissions control systems in the Fraudulent Vehicles—both of which Fiat Chrysler pitched to consumers as enablers of the Fraudulent Vehicles purported "clean" operation: (1) the Exhaust Gas Recirculation ("EGR") system and (2) the Selective Catalytic Reduction ("SCR") system.

137.    The EGR system reduces NOx in diesel emissions by lowering the temperature of the exhaust gas exiting the engine. The SCR system takes the NOx leftover from the EGR System and converts it into harmless nitrogen and water. Together, the EGR and SCR systems are vital to mitigating the pollution from the Fraudulent Vehicles' diesel emissions.

138.    As identified in the EPA's NOV, the Defendants installed a number of undisclosed auxiliary emission control devices ("AECDs") in the Fraudulent Vehicles that

compromised the EGR and SCR systems and resulted in substantially increased NOx emissions during real-world driving conditions. As exemplified herein, the Defendants knew that these AECDs were not allowed, but that the Fraudulent Vehicles could not achieve the fuel economy or performance that the Defendants marketed without them.

### 1. EGR AECD Strategy: EGR Rate Reduction

139.    Burning diesel fuel creates NOx. The amount of NOx produced by a diesel vehicle is a function of temperature: the hotter the exhaust gas is when it exits the engine, the more NOx it emits.

140.    The EGR system minimizes NOx by lowering the temperature of the engine exhaust through a recirculation process. The higher the rate of exhaust gas recirculation (the EGR rate), the lower the exhaust gas temperature. The lower the exhaust temperature, the lower the NOx. But, critically, the higher the EGR rate in a vehicle, the worse fuel economy it achieves. Defendants employed the EGR AECDs in the Fraudulent Vehicles to either reduce the EGR rate or shut it off entirely, thereby artificially and secretly increasing the Fraudulent Vehicles' fuel economy and drivability at the expense of increased NOx.

141.    One of the strategies Defendants used to reduce the EGR rate was through what the EPA has named AECD 5, which detects the engine temperature in the Fraudulent Vehicles and reduces the EGR rate during the vehicles' "warm-up phase" (the phase when the engine is heating up after a cold start). The EPA described AECD 5 as "EGR rate reduction based on engine temperature model." Defendants referred to it as "T_Eng" and various derivatives thereof (e.g., "t_engine" and "tEng").

142.    VM Motori knew as early as 2010 that T_Eng was an AECD (FCA-MDL-000456083) that, if concealed, would be illegal. In April 2010, a Fiat Chrysler powertrain

49

division employee attempted to assure VM Motori's Controls and Calibration Director, Sergio Pasini, that T_Eng did not employ "cycle detection" FCA-MDL-000452591. "Cycle detection" refers to any mechanism that allows a vehicle to detect when it is undergoing regulatory emissions testing, and modify its emissions accordingly. But Pasini knew better. Just two months later, he told his VM Motori colleagues, "the [EGR] rate will be managed mainly on t_engine which is, no matter what FIAT says, a cycle detection." *Id.* VM Motori regularly admitted that the T_Eng function employed "cycle detection" (12/2011 correspondence—FCA-MDL-000168161); "cycle recognition" (1/2012 correspondence—FCA-MDL-000377513; FCA-MDL-000377513_T001 (English translation)); and "cycle beating" (02/2013 correspondence—FCA-MDL-000430441-44; 06/2013—FCA-MDL-000295256). Pasini also understood that this AECD was not being disclosed to the EPA. FCA-MDL-000377499; FCA-MDL-000377499_T001-02 (English translation). In a May 2013 email, for example, Pasini told more than a dozen of his VM Motori colleagues that the T_Eng function was not active during emission testing and "has not been declared to regulators." *Id.*

143.    Fiat Chrysler also knew that T_Eng was an AECD, and critically, all the Defendants understood that it was necessary to achieve the desired fuel economy. In December 2011, VM Motori identified T_Eng as a "sort of 'cycle detection" to increase fuel economy (FCA-MDL-000168161) and said Fiat Chrysler gave them approval to use it (FCA-MDL-000377211). In January 2012, FCA Executive Bob Lee connected T_Eng to FCA's objective of achieving greater fuel economy in a presentation entitled "Fuel Economy Status Target." FCA-MDL-000000116. In February 2012, VM Motori directed Bosch to implement T_Eng, and told Bosch that VM Motori would explain to Fiat Chrysler that T_Eng was "what you need if you want 30 mpg." FCA-MDL-000015652. Fiat Chrysler later explored ideas to replace T_Eng

with a different strategy, but it abandoned that process after VM Motori informed FCA's Diesel Calibration Manager that the "F[uel] E[conomy] impact [of replacing T_Eng] is probably around 2 mpg highway." FCA-MDL-000430044. In an email sent the next day, VM Motori's Emanuele Palma told colleagues that "Chrysler knows tEng is the only way to get to 30 mpg, so don't worry about this topic." Id.

144.    Like VM Motori and Fiat Chrysler, Bosch also knew that T_Eng was an AECD that likely qualified as an "defeat device" under applicable regulations. FCA-MDL-000015652. In February 2012, Bosch warned VM Motori that T_Eng is an emissions "defeat device" and that they risked "serious penalties" if regulators found T_Eng to be cycle detection. Id. VM Motori refused to abandon T_Eng, however, and told Bosch "we are working closely with Chrysler [and] the feedback we've had so far about [using T_Eng] is positive." Id. The same month, Bosch sought to limit its liability from VM Motori's use of T_Eng, and even considered asking VM Motori to sign a risk release. RBL-MDL2777-PE-300402775-78. Yet, Bosch not only incorporated T_Eng into the emissions software for the Fraudulent Vehicles (FCA-MDL-000351953), Bosch appears to gone so far as to have advised VM Motori not to disclose T_Eng to regulators, if it planned to use the function (see, e.g., RBL-MDL2777-PE-300530521-23). Of course, this is exactly what they did.

145.    On December 2, 2015, Morrie Lee of FCA Regulatory Affairs asked FCA Senior Manager Emanuele Palma "[w]hat compelling or driving reason does a[n] [automobile manufacturer] have to reduce EGR operation in the field?" FCA-MDL-000002857. Palma responded simply: "Low EGR → low soot, good drivability, F[uel] E[conomy]." Id. Two days later, Lee told the EPA that Fiat Chrysler's failure to document T_Eng as an AECD was "an oversight of understanding." FCA-MDL-000002011. The documents cited herein show

otherwise.

## 2. SCR AECD Strategy: Dosing Disablement

146.    The SCR system uses DEF—a solution of urea and water—to convert NOx into harmless nitrogen and water after it exits the EGR system and before it is emitted from the tailpipe. The part of the emissions system where this process occurs is called the SCR catalyst. In theory, the SCR system injects or "doses" measured quantities of DEF into the exhaust stream based on a software program that injects the right amount of DEF to neutralize the amount of NOx being emitted by the engine.

147.    However, Defendants employed the SCR AECDs to either reduce the DEF dosing amount or shut it down entirely. With the DEF dosing reduced or disabled, the Fraudulent Vehicles emit more NOx.

148.    Reduced DEF dosing was important to Defendants for at least two reasons. First, the more DEF the Fraudulent Vehicles consumed, the more frequently consumers would have to refill the DEF tank—an inconvenience that would make the vehicles less marketable. Second, by the time the first Fraudulent Vehicles hit the market, the Defendants realized that the chemicals in the DEF were breaking down the materials in the SCR catalyst and causing these components to fail prematurely, which could be mitigated by reducing DEF dosing (at the expense of increased emissions).

149.    The Defendants relied heavily on an alternative DEF dosing mode called "online dosing," which limited the injection of DEF into the SCR catalyst, thereby compromising the SCR system. The EPA identified this alternative dosing functionality as AECD 7. Bosch and VM Motori first discussed "online dosing" in March 2011. FCA-MDL-000281212-14. Both parties acknowledged that, if used, online dosing would have to be disclosed as an AECD. *Id.*

("online dosing . . . could also be used outside cert cycle [but] needs to be declared at CARB").
Yet, in November 2012, Bosch implemented a software change to prevent online dosing from
activating during EGR diagnostic monitoring (RBL-MDL2777-PE-300068645-48), and in
February 2013, Kasser Jaffri of FCA's On Board Diagnostic group expressed concern to VM
Motori that CARB might see online dosing as "cycle beating" (FCA-MDL-000430441). Jaffri
concluded that, if applied, online dosing would have to be disclosed as an AECD. FCA-MDL-
000478134 ("Chrysler will request an AECD for [online dosing]"). It did not do so.

150.    VM Motori then told Fiat Chrysler in March 2013 that it was not going to use
the online dosing strategy. FCA-MDL-000433186. They used it anyway. In September 2013,
Jaffri reported to FCA Senior Manager Dan Hennessey, head of the On Board Diagnostic group,
that online dosing was (1) active in the vehicles; (2) had not been disclosed to CARB or the EPA;
and (3) "reduces the conversion efficiency effectiveness," thereby resulting in increased NOx
emissions. FCA-MDL-000740696. Understandably, Jaffri observed that this "continues to be
an area of concern." *Id.* He also told Hennessy that when online dosing was active, diagnostic
monitoring meant to track the performance of the SCR system "cannot be run", because, if active,
the diagnostic monitoring would reveal that the SCR system was not functioning. *Id.*

151.    In September 2014, Fiat Chrysler senior management, including March Shost
and Dan Hennessey, received a presentation from Emanuele Palma entitled "WK/DS MY15
DEF dosing strategy." One slide in that presentation labeled "online dosing strategy" noted that
Fiat Chrysler's competitors were using online dosing and that Fiat Chrysler could too—but,
critically, that the dosing strategy needed "to be agreed with the agencies." FCA-MDL-
000417114-25. No such agreement was reached, because Fiat Chrysler never disclosed the
functionality.

152.    In July 2015, Fiat Chrysler acknowledged that tests conducted on the Model Year 2014 Fraudulent Vehicles showed that the vehicles were not meeting NOx emissions standards because the SCR catalysts—which Bosch provided for the Fraudulent Vehicles (RBL-MDL2777-PE- 300160491-504)—were failing (FCA-MDL-000713128). In a presentation given that month entitled "SCR Catalyst Responsibility Share," Bosch noted in its "investigation history" chronology that it began to investigate the SCR catalyst as the reason FCA development vehicles were experiencing excess NOx emissions in February 2013. RBL-MDL2777-PE-300166279- The investigation chronology further identified a "dosing calibration strategy change" to reduce dosing rates. *Id*. Bosch admitted that VM Motori made the change on Bosch's recommendation. *Id*.

153.    In sum, the Defendants all knew that the Fraudulent Vehicles contained undisclosed apparatuses that reduced or disabled the emissions control systems in real-world driving conditions, and they knew that without those undisclosed apparatuses, the Fraudulent Vehicles could not deliver the fuel economy and performance that Fiat Chrysler promised. Defendants concealed this fact from consumers and regulators and, in so doing, cheated Plaintiffs of the vehicles they thought they were buying.

## "DIESELGATE" SCANDALIZES THE GLOBAL AUTO INDUSTRY

154.    The world was shocked to learn that Volkswagen had manufactured over 11 million diesel cars that were on the roads in violation of European emission standards, and over 565,000 vehicles operating in the United States in violation of EPA and state emission standards. But Volkswagen was not the only one.

155.    In the wake of the Volkswagen "defeat device" scandal, scientific literature and reports and testing indicate that many other so-called "clean diesel" vehicles emit far more

pollution on the road than in lab tests. The EPA has since widened its probe of diesel emissions to include the Fraudulent Vehicles at issue here.

156.    In May 2015, a study conducted on behalf of the Dutch Ministry of Infrastructure and the Environment found that all sixteen (16) diesel vehicles made by different manufacturers, when tested, emitted significantly more NOx on real-world trips but nevertheless passed laboratory tests. The report concluded that "[i]n most circumstances arising in normal situations on the road, the system scarcely succeeded in any effective reduction of NOx emissions."

157.    The report further remarked:

> It is remarkable that the NOx emission under real-world conditions exceeds the type approval value by [so much]. It demonstrates that the settings of the engine, the EGR [(exhaust gas recirculation)] and the SCR during a real-world test trip are such that they do not result in low NOx emissions in practice. In other words: In most circumstances arising in normal situations on the road, the systems scarcely succeed in any effective reduction of NOx emissions.

The lack of any "effective reduction of NOx emissions" is devastating to "clean diesel" advertising, including that for the Fraudulent Vehicles at issue here.

158.    Other organizations are beginning to take notice of the emission deception. The Transportation and Environment ("T&E") organization, a European group aimed at promoting sustainable transportation, compiled data from "respected testing authorities around Europe." T&E stated in September 2015 that real-world emission testing showed drastic differences from laboratory tests, such that models tested emitted more pollutants on the road than in the lab. "For virtually every new model that comes onto the market the gap between test and real-world performance leaps," the report asserts.

159.    In a summary report, T&E graphically depicted the widespread failure of most manufacturers to meet emission standards. The T&E report found that the current system for

testing cars in a laboratory produces "meaningless results," because manufacturers like Fiat Chrysler can engineer their cars to "pass" the laboratory tests but emit many times as much pollution under normal driving conditions.

160.    Emissions Analytics is a U.K. company formed to "overcome the challenge of finding accurate fuel consumption and emission figures for road vehicles." With regard to its recent on-road emission testing, the company explains:

[I]n the European market, we have found that real-world emissions of the regulated nitrogen oxides are four times above the official level, determined in the laboratory. Real-world emissions of carbon dioxide are almost one-third above that suggested by official figures. For car buyers, this means that fuel economy on average is one quarter worse than advertised. This matters, even if no illegal activity is found.

## DEFENDANTS ARE CAUGHT CHEATING

### A. Testing Reveals Cheating.

161.    In late 2016, a 2015 Ram 1500 pickup was tested using a Portable Emissions Measurement System ("PEMS"). Testing revealed that Fiat Chrysler also cheated in that it had concealed the fact that the Ram 1500 spews more than the legal amount of emissions and fails to meet its own "no NOx" out-of-the-tailpipe promise.

162.    The applicable standard both at the federal and state level is 50 mg/mile of NOx for "FTP Style" driving: *i.e.*, city driving. Testing was conducted with a PEMS unit to simulate driving conditions under both the FTP certification cycle and the highway certification cycle.

163.    The Ram 1500 emits an average of 159 mg/mile of NOx and a maximum of 1,283 mg/mile on flat roads, and 222 mg/mile of NOx with a maximum of 1,859 mg/mile on hills. For highway driving, the average was 232 mg/mile and a maximum of 1,615 mg/mile,

compared to the 70 mg/mile standard. On hills, the numbers are 353 mg/mile and 3,240 mg/mile. Testing also revealed a device triggered by ambient temperature that significantly derates the performance of the NOx emission reduction system, with ambient threshold temperatures above approximately 95°F and below 40-50°F. The resulting NOx emissions increase by a factor of 10 when above or below these threshold temperatures. Testing also revealed the presence of a device that is triggered when ascending hills, as the emission control system appears to be significantly derated after a short period of steady driving on hills. As a result, NOx emissions increase after about 500-1000 seconds on hills with grades as low as 1%, where emissions are often 10 times the highway standard. For grades as little as 0.4%, emissions were found to be as high as 6 times the highway standard.

164.    The Ram 1500's emission software is a "Bosch EDC17," as is the Jeep Grand Cherokee's emission software. The same basic emission system is in the Grand Cherokee EcoDiesel® and the engines are identical.

165.    In separate testing, a 2014 Ram 1500 equipped with an EcoDiesel® engine and featuring SCR NOx after-treatment technology was tested on a chassis dynamometer as well as on the road. In both scenarios, gaseous exhaust emissions, including oxides of nitrogen (NOx), nitrogen oxide (NO), carbon monoxide (CO), carbon dioxide (CO2), and total hydrocarbons (THC) were measured on a continuous basis using a PEMS from Horiba®.

166.    The tests showed significantly increased NOx emissions during on-road testing as opposed to testing on a chassis dynamometer (*i.e.*, in the laboratory). On the road, over an urban/suburban route, the vehicle produced average NOx emissions that exceeded federal certification standards by approximately 15-19 times. When tested on a highway, the average NOx emissions measured 35 times the EPA Tier 2 Bin 5 standard.

### B. The EPA Issues A Notice of Violation to Fiat and FCA.

167.    On January 12, 2017, the EPA issued a NOV to Fiat and FCA for failing to

justify or disclose defeat devices in model year 2014–2016 Ram 1500 EcoDiesel® and 2014–

2016 Jeep Grand Cherokee EcoDiesel® vehicles (the Fraudulent Vehicles at issue here).  CARB

also issued a Notice of Violation to Fiat and FCA.  Since then, the EPA, by and through the

Department of Justice, has sued Fiat, FCA, VM Italy, and VM America for violations of the

CAA.

168.    The EPA's NOV and lawsuit arose in part from emission testing performed by

the EPA at the National Vehicle and Fuel Emissions Laboratory.  The EPA performed this testing

"using driving cycles and conditions that may reasonably be expected to be encountered in

normal operation and use, for the purposes of investigating a potential defeat device."

169.    The EPA identified at least eight AECDs in the Fraudulent Vehicles that were

concealed on COC applications:

- AECD 1 (Full EGR Shut-Off at Highway Speed)

- AECD 2 (Reduced EGR with Increasing Vehicle Speed)

- AECD 3 (EGR Shut-off for Exhaust Valve Cleaning)

- AECD 4 (DEF Dosing Disablement during SCR Adaptation)

- AECD 5 (EGR Reduction due to Modeled Engine Temperature)

- AECD 6 (SCR Catalyst Warm-Up Disablement)

- AECD 7 (Alternative SCR Dosing Modes)

- AEDC 8 (Use of Load Governor to Delay Ammonia Refill of SCR Catalyst)

170.    The EPA testing found that "some of these AECDs appear to cause the vehicle

to perform differently when the vehicle is being tested for compliance with the EPA emission

standards using the Federal emission test procedure (e.g., FTP, US06) than in normal operation

and use." For example:

   a.    AECD 3, when combined with either AECD 7 or AECD 8, disables the EGR system without increasing the effectiveness of SCR system. Under some normal driving conditions, this disabling reduces the effectiveness of the overall emission control system. The AECD 3 uses a timer to shut off the EGR, which does not appear to the EPA to meet any exceptions to the regulatory definition of "defeat device."

   b.    AECD 5 & 6 together reduce the effectiveness of the NOx emission control system, using a timer to discontinue warming of the SCR after-treatment system, which reduces its effectiveness.

   c.    AECD 4, particularly when combined with AECD 8, increases emissions of tailpipe NOx during normal vehicle operation and use. The operation of AECD 1, AECD 2, and/or AECD 5 increase the frequency of occurrence of AECD 4.

   d.    AECDs 7 & 8 work together to reduce NOx emissions during variable- grade and high-load conditions.

171.    The EPA further found that Fiat and FCA did not disclose or justify these control

devices in their COC applications, as required by EPA regulations, and that Fiat and FCA were

therefore in violation of the CAA each time they sold, offered for sale, introduced in commerce,

or imported one of the approximately 103,828 Fraudulent Vehicles. The EPA is now seeking

injunctive relief and penalties.

## C. Bosch Software Documentation Further Verifies the Violations

172.    Researchers have obtained Bosch software documentation describing the

functions, modules, structure, variables and calibration parameters believed to be installed in

Fraudulent Vehicles. The documentation is over 10,000 pages long and contains hundreds of

functions and thousands of variables developed by Bosch that describe the operation of the

engine. These parameters and functions correlate with many of the violations alleged by the

EPA and CARB. Critically, these functions, designed and implemented by Bosch, have elements

that have no legitimate purpose in normal use. At the same time, these same elements, when

enabled, allow the functions to reduce the effectiveness of emission controls in real world driving conditions, but not during an emission test cycle.

### 1. AECDs 1 and 2: Reducing or Disabling EGR at Highway Speeds

173.    The function named *"AirCtl_RatDesValCalc"* described in the Bosch documentation as *"Exhaust gas recirculation control - EGR ratio setpoint calculation"* is used to calculate the desired EGR rate. The software documentation contains figures with flow diagrams describing the inputs, outputs, and calculation performed by this software function. Bosch has included vehicle speed as an input used by the EGR control function to modify the EGR rate (and, thus, NOx emission). Vehicle speed is notable because there is no legitimate reason for the EGR rate to depend directly on vehicle speed.

174.    By allowing EGR rate to depend directly on vehicle speed, Bosch provided a means by which Fiat and FCA could reduce the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use. This function may be, and is likely to have been, used to implement the undisclosed AECDs 1 and 2 identified in the EPA NOV to Fiat and FCA.

### 2. AECD 3: EGR Shut-Off for Exhaust Valve Cleaning

175.    AECD 3 identified in the EPA NOV has also been identified in Bosch's software documentation in the function named *"AirCtl_Mon"* described in the Bosch documentation as *"Exhaust gas recirculation control – Monitoring and shut-off."* Bosch described this AECD as ostensibly providing a cleaning mechanism for the engine exhaust valves when the Fraudulent Vehicle is in overrun (*i.e.*, the engine is turning without combustion, such as when the vehicle is going downhill). To accomplish this cleaning, the function created by Bosch closes the EGR valve (turning off EGR), so a "huge gush of clean air" can remove deposits. However, Bosch

also programmed a software switch (named "*AirCtl_swtOvrRunOff_C*") that allowed Fiat and FCA to enable exhaust valve cleaning in normal (non-overrun) operation, effectively disabling EGR.

176.    Together with an activation delay added by Bosch—controlled by *AirCtl_tiEngRunDrvCycMin_C*, which is described as *"Calibration time after which exhaust valve cleaning routine can start"*—the *AirCrl_Mon* function can be readily used as a defeat device. To do so, Bosch would calibrate the ECU to enable valve cleaning in outside of overrun (*AirCtl_swtOvrRunOff_C* = TRUE), but only after the duration of a typical emission test cycle (*AirCtl_tiEngRunDrvCycMin_C* = 1800 seconds). This would disable EGR after an emission test cycle, resulting in increased NOx emission. This function may be, and is likely to have been, used to implement undisclosed AECD 3 identified in in the EPA and CARB NOVs.

### 3. AECD: Alternative SCR Dosing Modes

177.    Bosch included a timer in another function, without a legitimate purpose. The Bosch function named "*SCRFFC_Main*," described in documentation as *"Calculation of the NH3 precontrol quantity"* has an input variable timer entitled "*CoEng_tiNormal*," which holds the time duration since the engine was started. This variable can be used to reduce SCR efficiency, and, therefore, increase NOx emission, after a certain time has elapsed. In particular, this timer may be set to the duration of a typical emission test cycle. There is no legitimate reason for SCR control to depend directly on the time duration since engine start. By making SCR control depend directly on time duration since engine start, however, Bosch has provided a means by which Fiat and FCA could reduce the effectiveness of the emission control system in real world driving conditions. This function may be, and is likely to have been, used to implement undisclosed AECD 7 identified in the EPA and CARB NOVs.

**D. West Virginia University Testing of the Fraudulent Vehicles**

178.    Beginning in 2015, researchers at the West Virginia University Center for Alternative Fuels, Engines, and Emissions—the same researchers instrumental in uncovering Volkswagen's fraud—tested 5 model year 2014 and 2015 vehicles produced by FCA. The test vehicles comprised the Fraudulent Vehicles at issue here: Jeep Grand Cherokees and Ram 1500 diesel vehicles, all equipped with the 3.0L EcoDiesel® engine, and featuring SCR NOx after-treatment technology.

179.    All test vehicles were evaluated on a vehicle chassis dynamometer representing the test conditions for regulatory compliance. Each vehicle was also tested over-the-road using a PEMS device during a variety of driving conditions including urban/suburban and highway driving.

180.    One of the Jeep Grand Cherokees and one of the Ram 1500 vehicles was tested prior to, as well as after, a mandatory vehicle recall in April 2016 – the "R69 recall" – which included a software "reflash" by FCA that concerned the vehicles' emission control systems.

181.    Results indicated that both Jeep Grand Cherokee and Ram 1500 in May 2014 exhibited significantly increased NOx emissions during on-road operation as compared to the results observed through testing on the chassis dynamometer. For May 2015, Jeep vehicles produced from 4 to 8 times more NOx emissions during urban/rural on-road operation than the certification standard, while Ram 1500 vehicles emitted approximately 25 times the NOx permitted by EPA Tier2-Bin5 standard for highway driving conditions.

182.    The researchers noted that for the vehicles tested post-recall using the dynamometer, NOx emissions were similar or slightly lower than that observed for vehicles tested pre-recall. But on-road emissions were still very different from emissions observed through

chassis dynamometer testing, even though they were slightly improved from the levels observed during pre-recall testing.

### E. European Investigation and Testing

183.    Fiat Chrysler and Bosch have both found themselves in trouble with German regulators in the wake of the Volkswagen scandal.

184.    German prosecutors have launched an investigation into Bosch, reportedly raiding Bosch's offices in Stuttgart. In April 2016, Bosch GmbH representatives met with Germany's Federal Motor Transport Authority ("KBA") on at least two occasions. In an April 14, 2016 meeting, Bosch admitted there were a number of anomalies in the calibration of its engine control units provided to Fiat Chrysler for diesel vehicles sold in Europe. Bosch confirmed that it had delivered the control units for the vehicles as well as the associated software and that Bosch employees had integrated the emission-related applications into the software. Bosch admitted that the software reduced the EGR rate and the regeneration of NSC (NOx storage catalyst) after an elapsed period of driving time or number of cycles. Specifically, 22 minutes after the start of the engine (the estimated duration of emission testing), the software reduced the EGR rate to nearly zero and de-activated NSC regeneration. Another trigger for de-activation of the NSC regeneration occurred after the vehicle had been driven a distance of 100 kilometers. Bosch confirmed that the NOx emissions for the vehicles exceeded the legal limits by a factor of 4-5. The KBA's takeaway from its meetings with Bosch was there is a defeat device in the vehicles and Bosch shared responsibility for the defeat device with Fiat Chrysler. Media reports have confirmed the same.

185.    After the meeting with Bosch, the KBA performed testing on the Fiat diesel vehicles and confirmed that the emission controls were disabled after 22 minutes of driving time,

causing the vehicles to emit more than 10 times the legal limit of NOx. The KBA concluded that the vehicles were designed to cheat on emission tests, which normally run for about 20 minutes. As a result, the KBA's transport minister announced: "We will need to carry out further tests on Fiat models." In August 2016, the German government formally concluded that Fiat vehicles sold in the EU had used defeat devices.

186.     More recently, 17-page long-form article published by the German weekly investigative news magazine *Der Spiegel*, on April 20, 2018, details the central role Bosch played in the "diesel scandal." The article reports that prosecutors in Germany are investigating Bosch for providing and programming illegal software for use in Fiat vehicles, among many others.

### F.   Joint University of California, San Diego and German Study of the Fiat 500X

187.     The testing of European regulators has been confirmed by independent testing conducted here in the United States. A recent peer-reviewed study by researchers at the University of California, San Diego and Ruhr-Universität Bochum in Germany analyzed firmware in the EDC Unit 17 of the Fiat 500X and found a defeat device affecting the logic governing NOx storage catalyst regeneration. Unlike the Volkswagen defeat device, the researchers found that the mechanism in the Fiat 500X relied on timing, reducing the frequency of NSC approximately 26 minutes and 40 seconds after the engine was started. (By reducing the frequency of NOx storage catalyst regeneration, a manufacturer can improve fuel economy and increase the service life of the diesel particulate filter, at the cost of increased NOx emissions.)

188.     According to the study, the conditions used to determine when to regenerate the NSC were duplicated, and each set of conditions could start a regeneration cycle. The researchers obtained Bosch copy-righted documentation for a Fiat vehicle, which described two sets of conditions using the terms "during homologation cycle" and "during real driving." The term

"homologation" is commonly used in Europe to describe the process of testing an automobile for regulatory conformance.    Bosch's authorship of the document and use of the terms "homologation [testing]" and "real driving" to describe the regeneration conditions demonstrate that it not only created the mechanism for Fiat Chrysler but was also aware of the mechanism's intended purpose of circumventing emission testing.

189.    Together, these facts reveal that Defendants have fraudulently concealed the functions of its emission control technology from regulators and consumers alike.    Further, they demonstrate that Fiat Chrysler's claims about its EcoDiesel® Fraudulent Vehicles as "clean diesel" with "ultralow emissions" and "no NOx" emitted through the tailpipe is false or misleading.

### THE DAMAGE CAUSED BY DEFENDANTS' DIRTY DIESEL SCHEME

190.    Plaintiffs paid a significant premium for the EcoDiesel features that FCA falsely advertised.    Indeed, consumers paid between $3,120 and $5,000 more for the EcoDiesel option than for the comparable gasoline vehicles.    In return, FCA promised power, performance, fuel economy, and environmental friendliness (and vehicles that were legal to drive).    FCA could not deliver on that promise.    Plaintiffs suffered significant harm as a result.

191.    FCA may not be able to bring the Fraudulent Vehicles into compliance with emissions standards.    If that is the case, those vehicles will have to be removed from the road.

192.    But even if FCA can bring the Fraudulent Vehicles into compliance with emission standards, it will not be able to do so without substantially degrading their performance characteristics, including their horsepower and/or fuel efficiency and/or maintenance requirements.    Consequently, will not possess the vehicles they thought they purchased and will not have received the benefit of the bargain.    This will also result in a diminution in value of

every Fraudulent Vehicle, and it will cause owners and lessees of Fraudulent Vehicles to pay more for the use of their Fraudulent Vehicles.

193.    Assuming, for the sake of argument, that the Fraudulent Vehicles could be brought into compliance with emission standards without any material degradation to performance or maintenance characteristics—and if that were the case, it begs the question as to why FCA cheated in the first place—Plaintiffs would still have been deprived of the benefit of the bargain for all the years they owned and/or leased the Fraudulent Vehicles that could not and did not deliver all of the characteristics for which Plaintiffs paid a premium, and were not compliant with U.S. law.

194.    In sum, had regulators or the public known the true facts, Plaintiffs would not have purchased or leased the Fraudulent Vehicles (in fact, they could not have legally been sold), or would have paid substantially less for them.

## TOLLING OF THE STATUTES OF LIMITATIONS

### Discovery Rule

195.    The tolling doctrine was made for cases of fraudulent concealment like this one. Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, that the defendants had conspired to install software that would evade emissions regulations, and that the defendants were concealing and misrepresenting the true emissions levels of its vehicles.

196.    The fraud, as set forth herein, was elaborate and well concealed. Indeed, the EPA and CARB uncovered the software manipulation only through a sophisticated and costly investigation involving highly technical equipment.

197.    Plaintiffs had no realistic ability to discover the presence of the defeat devices, or to otherwise learn of the fraud, until it was discovered by the EPA and CARB and revealed to the public through their respective Notices of Violation.

198.    Any statutes of limitation otherwise applicable to any claims asserted herein have thus been tolled by the discovery rule.

### Fraudulent Concealment

199.    All applicable statutes of limitation have also been tolled by Defendants' knowing, active and ongoing fraudulent concealment of the facts alleged herein.

200.    Defendants have known of the emission control software installed in the Fraudulent Vehicles since at least 2014, when Defendants began installing them. Since then Defendants have intentionally concealed from, or failed to notify, regulators, Plaintiffs and the driving public of the undisclosed Cheat Devices and the true level of emissions and performance of the Fraudulent Vehicles.  There is no question that the Cheat Devices were installed to intentionally deceive regulators, and the public.

201.    Despite knowing about the Cheat Devices and the unlawful emissions during real-world driving conditions, Defendants did not acknowledge the problem, even after the EPA and CARB issued their Notices of Violation. Even to the present day, Defendants have denied any wrongdoing.

202.    Any otherwise-applicable statutes of limitation have therefore been tolled by the knowledge and active concealment of the facts by the defendants as alleged herein.

### Estoppel

203.    Defendants were and are under a continuous duty to disclose to Plaintiffs the true character, quality, and nature of the Fraudulent Vehicles, including its emissions system and its

compliance with applicable federal and state law. Instead, they have actively concealed the true character, quality, and nature of the Fraudulent Vehicles and knowingly made misrepresentations about the quality, reliability, characteristics, and performance of the Fraudulent Vehicles.

204.   Plaintiffs reasonably relied upon the knowing and affirmative misrepresentations and/or active concealment of these facts.

205.   Based on the foregoing, Defendants are estopped from relying on any statutes of limitation in defense of this action

### American Pipe Tolling

206.   Under the U.S. Supreme Court's decision in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) and its progeny, any applicable statutes of limitation were tolled by the filing of the federal class action complaint in *In re Chrysler-Dodge-Jeep Ecodiesel Marketing, Sales, Practices, and Products Liability Litigation*, 3:15-md-02777-EMC (N.D. Cal.).

### CLAIMS FOR RELIEF

### FEDERAL CLAIMS

### FEDERAL COUNT I
### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO")
#### Violation of 18 U.S.C. § 1962(c)-(d)
#### (On behalf of all Plaintiffs)

207.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

208.   Plaintiffs bring this action against all Defendants.

209.   For purpose of this Count, Defendants are referred to as the "RICO Defendants."

210.   Fiat conducts its business—legitimate and illegitimate—through various affiliates and subsidiaries, like FCA, VM Italy, and VM America, each of which is a separate legal entity. The Bosch Group also conducts its business, both legitimate and illegitimate,

through hundreds of companies, subsidiaries, and affiliates, including Bosch GmbH and Bosch LLC. At all relevant times, each of the RICO Defendants has been a "person" under 18 U.S.C. § 1961(3) because each was capable of holding "a legal or beneficial interest in property."

211.    Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

212.    Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. See 18 U.S.C. § 1962(d).

213.    As part of a strategy to expand its North American presence, in 2009, Fiat began its acquisition of one of the "Big 3" U.S. automakers, Chrysler. In November of that year, CEO Marchionne unveiled an ambitious 5-year plan to, among other things, roll out "more diesel variants" of Jeep and to give Ram "Light duty (1500)" a "refresh/facelift."

214.    By 2014, Fiat had become Fiat Chrysler Automobiles, Chrysler had become FCA, and VM Motori, a longtime supplier, was now part of the Fiat Chrysler sprawling family of affiliated companies. In May of that year, Marchionne announced another five-year plan at Auburn Hills, Michigan headquarters to increase Fiat Chrysler's competitiveness against global auto behemoths, such as Toyota, Defendants, and General Motors, by increasing annual sales to 7 million vehicles by 2018, up from 4.4 million in 2013. Integral to the strategy was the expansion of the "Jeep portfolio" and updates to the "bread-and-butter Ram 1500," including "diesel engines."

215.    During this same time frame, emission standards in the United States were ratcheting up. In contrast to other global automakers, like Toyota and Ford, which were focusing

on developing hybrid and electric cars, Chrysler—now FCA and under the control of Fiat—took another path: "[r]eflecting its ties with Europe-based Fiat, Chrysler appears to be taking yet another route that focuses less on electrification and more heavily on light-duty diesels and compressed natural gas." In 2012, Marchionne observed, "with 2016 'just around the corner' and 2025 not far away given the auto industry's long product-development lead times, 'there are big choices to be made[.]'" Marchionne explained that "Chrysler, which is starting to share platforms and powertrains with Fiat, wants to leverage the European auto maker's strengths in diesels and CNG-powered vehicles." As one commenter put it at the time, "[f]uel-efficient towing remains a strong point of diesels, and Marchionne says he still is optimistic about the potential of light-duty diesels in the U.S. despite significant emissions challenges."

216.    As it turned out, however, Fiat Chrysler was either unable or unwilling to devise a solution within the constraints of the law. And so, like Defendants, they devised one outside of it. Instead of cutting their losses, holding up the Fraudulent Vehicle roll outs, or coming clean, they conspired with VM Italy and VM America and Bosch GmbH and Bosch LLC to install customized emission treatment software (EDCs) in the EcoDiesel®'s engine diesel controls so that the Fraudulent Vehicles could "pass" the EPA and CARB testing. The software disabled or restricted certain of the emission controls during real-world driving conditions, however, causing the Vehicles to spew up to 25 times the legal limits of NOx. These software controls were concealed from regulators on COC and EO applications for the Vehicles by FCA, thus deceiving the EPA and CARB into approving the Fraudulent Vehicles for sale throughout the United States and California.

217.    To accomplish their scheme or common course of conduct, Fiat, FCA, VM Italy, VM America, Bosch GmbH, and Bosch LLC, along with others, had to work together to conceal

the truth. Each defendant was employed by or associated with, and conducted or participated in the affairs of, one or several RICO enterprises (defined below and referred to collectively as the "EcoDiesel® RICO Enterprise"). The purpose of the EcoDiesel® RICO Enterprise was to deceive regulators into believing that the Fraudulent Vehicles were eligible for coverage by a COC and/or EO and compliant with emission standards. The motivation was simple: to increase Defendants' revenues and profits and minimize their losses from the design, manufacture, distribution and sale of the Fraudulent Vehicles and their component parts. As a direct and proximate result of their fraudulent scheme and common course of conduct, the RICO Defendants were able to extract over a billion dollars from consumers. As explained below, their years-long misconduct violated Sections 1962(c) and (d).

A. **Description of the EcoDiesel® RICO Enterprise**

218.    In an effort to expand its market share in the United States and beyond, Fiat, a publicly-traded Italian-controlled, Dutch-registered company headquartered in London, bought then-Chrysler (now FCA), a separate Delaware company, headquartered in Michigan. Fiat uses FCA to design, market, manufacture and sell the Fraudulent Vehicles and other vehicles under the Chrysler, Dodge, Jeep, Ram, and Fiat brands throughout the United States. FCA also submitted the COC and EO applications for the Fraudulent Vehicles. Fiat used VM Italy and VM America to design and manufacture the EcoDiesel® engines for the Fraudulent Vehicles, which were calibrated in Michigan with Bosch's hidden software. Fiat, FCA, VM Italy, and VM America maintained tight control over the design, manufacture, calibration, and testing of the Vehicles. Bosch also participated, either directly or indirectly, in the conduct of the enterprise's affairs by developing, writing the software code customized for the Fraudulent Vehicles, and concealing the hidden software installed in the Fraudulent Vehicles in order to allow them to

"pass" testing but then disable or restrict certain emission controls during real-world driving conditions.

219.    At all relevant times, the RICO Defendants, along with other individuals and entities, including unknown third parties involved in the design, calibration, manufacture, testing, marketing, and sale of the Fraudulent Vehicles or the emission controls therein, operated an association-in-fact enterprise, which was formed for the purpose of fraudulently obtaining COCs from the EPA (and EOs from CARB) in order to sell the Fraudulent Vehicles throughout the United States (and California), and through which enterprise they conducted a pattern of racketeering activity under 18 U.S.C. § 1961(4). The enterprise is called the "EcoDiesel® RICO Enterprise."

220.    At all relevant times, the EcoDiesel® RICO Enterprise constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. §1961 (4), as legal entities as well as individuals and legal entities associated-in-fact for the common purpose of engaging in the RICO Defendants' unlawful profit-making scheme.

221.    The association-in-fact EcoDiesel® RICO Enterprise consisted of at least the following entities and individuals, and likely others:

### 1. The Fiat Chrysler Defendants

222.    Fiat Chrysler is the seventh-largest automaker in the world based on total annual vehicle sales and is an international automotive group. Fiat is listed on the New York Stock Exchange under the symbol "FCAU" and on the Mercato Telematico Azionario under the symbol "FCA." FCA is not publicly traded and thus has no SEC reporting obligations, but it does have reporting obligations, protections and responsibilities unique to the State of Delaware. FCA is a distinct legal entity, controlled and owned (indirectly) by Defendant Fiat. FCA's day-

to-day operations are managed by employees of both Fiat and FCA. Fiat's Group Executive Committee are based in FCA's Michigan headquarters. Fiat and FCA worked closely with VM Italy and VM America to develop and calibrate the EcoDiesel® engines for the Fraudulent Vehicles and to gather information for submission to regulators in the COC and EO applications by FCA. Each of these Defendants knew or recklessly disregarded that the Fraudulent Vehicles were unable to (and did not) comply with U.S. emission standards and yet concealed this information from regulators.

223.    Working with other members of the EcoDiesel® RICO Enterprise, Fiat and FCA conspired to install and conceal emission control software in the EcoDiesel® engines to illegally circumvent stringent U.S. emission standards. Employing this technology, Fiat Chrysler fraudulently obtained COCs and EOs for the Fraudulent Vehicles even though they emit unlawful levels of toxic pollutants into the atmosphere during normal operating conditions. Further, they concealed this information from regulators once questions were raised.

### 2. The VM Motori Defendants

224.    As explained above, Fiat bought 50% of VM Italy in 2011 and the remaining 50% stake from General Motors in 2013. Fiat Chrysler used VM Italy and VM America to design, calibrate, and manufacture the EcoDiesel® engine to be used in the Fraudulent Vehicles. Fiat and FCA worked with, and oversaw, VM Italy and VM America in the development and calibration of the engines at Michigan headquarters. Employees from VM Italy and VM America worked jointly on the manufacturing and/or assembling the engines for the Vehicles in the United States. And VM Italy and VM America performed engine calibrations, including calibrations involving the concealed emission control technology for the Vehicles. For example, VM Motori's Calibration Leader for the Vehicles was based in Michigan and reported to

73

management at both VM Italy and VM America. Finally, VM Italy and VM America provided information to FCA for inclusion in the COC and EO applications. VM Italy and VM America knew or recklessly disregarded that the EcoDiesel® engines in the Fraudulent Vehicles were unable to comply with U.S. emission standards and yet concealed this information from regulators.

### 3. The Bosch Defendants

225. As explained above, the Bosch Defendants supplied the emission control technology at issue—EDC Unit 17s—which were installed in the Fraudulent Vehicles. Bosch GmbH is a multinational engineering and electronics company headquartered in Germany, which has hundreds of subsidiaries and companies, including in the United States. It wholly owns Bosch LLC, a Delaware limited liability company headquartered in Farmington Hills, Michigan. Bosch's sectors and divisions are grouped by subject matter, not location. Mobility Solutions is the Bosch sector at issue, particularly its Diesel Services division, and it encompasses employees of both Bosch GmbH and Bosch LLC. These individuals were responsible for the design, manufacture, development, customization, and supply of the EDC units for the Fraudulent Vehicles.

226. Bosch's relationship with key corporate partners, such as Fiat, which brought in millions of dollars in annual revenue for Bosch.

227. Bosch worked with Fiat and FCA to develop and implement a specific and unique set of software algorithms to surreptitiously evade emission regulations by deactivating certain controls under real-world driving conditions. Bosch was well aware that the EDC Unit 17 would be used for this purpose. Bosch was also critical to the concealment of these software functions in communications with regulators.

**B. The EcoDiesel® RICO Enterprise Sought to Increase Defendants' Profits and Revenues.**

228.    The EcoDiesel® RICO Enterprise began as early as 2009, when Fiat began to acquire FCA and later VM Motori.    Fiat Chrysler and Bosch entered into an agreement to develop and install EDC Unit 17's into over a hundred thousand Fraudulent Vehicles sold in the United States.  It was not until September 2015 that the scheme began to unravel, when U.S. regulators uncovered Defendants' defeat devices provided by Bosch and questions were raised as to whether other diesel automakers were cheating, too.

229.    At all relevant times, the EcoDiesel® RICO Enterprise: (a) had an existence separate and distinct from each RICO Defendant; (b) was separate and distinct from the pattern of racketeering in which the RICO Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including Fiat and FCA, their network of dealerships, VM Italy, VM America, Bosch GmbH, Bosch LLC, and other entities and individuals associated for the common purpose of designing, calibrating, manufacturing, distributing, testing, marketing, and selling the Fraudulent Vehicles to consumers, including Plaintiffs, through fraudulent COCs and EOs, false emissions tests, false or misleading sales tactics and materials, and deriving profits and revenues from those activities. Each member of the EcoDiesel® RICO Enterprise shared in the bounty generated by the enterprise, i.e., by sharing the benefit derived from increased sales revenue generated by the scheme to defraud Plaintiffs nationwide.

230.    The EcoDiesel® RICO Enterprise functioned by selling vehicles and component parts to the consuming public. Many of these products are legitimate, including vehicles that do not contain concealed AECDs. However, the RICO Defendants and their co-conspirators, through their illegal Enterprise, engaged in a pattern of racketeering activity, which involves a

fraudulent scheme to increase revenue for Defendants and the other entities and individuals associated-in-fact with the Enterprise's activities through the illegal scheme to sell the Vehicles.

231.    The EcoDiesel® RICO Enterprise engaged in, and its activities affected, interstate and foreign commerce, because it involved commercial activities across state boundaries, such as the marketing, promotion, advertisement and sale or lease of the Vehicles throughout the country, and the receipt of monies from the sale of the same.

232.    Within the EcoDiesel® RICO Enterprise, there was a common communication network by which co-conspirators shared information on a regular basis. The enterprise used this common communication network for the purpose of manufacturing, marketing, testing, and selling the Fraudulent Vehicles to the general public nationwide.

233.    Each participant in the EcoDiesel® RICO Enterprise had a systematic linkage to each other through corporate ties, contractual relationships, financial ties, and continuing coordination of activities.  Through the EcoDiesel® RICO Enterprise, the RICO Defendants functioned as a continuing unit with the purpose of furthering the illegal scheme and their common purposes of increasing their revenues and market share, and minimizing losses.

234.    The RICO Defendants participated in the operation and management of the EcoDiesel® Enterprise by directing its affairs, as described herein. While the RICO Defendants participated in, and are members of, the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

235.    Fiat and FCA exerted substantial control over the EcoDiesel® RICO Enterprise, and participated in the affairs of the Enterprise, by:

A.   installing emission control software that deactivates or restricts one or more of the controls during real-world driving conditions;

B.   concealing these software functions from regulators;

C.   failing to correct or disable the hidden software when warned;

D.   manufacturing, distributing, and selling the Fraudulent Vehicles that emitted greater pollution than allowable under the applicable regulations;

E.   misrepresenting and omitting (or causing such misrepresentations and omissions to be made) vehicle specifications on COC and EO applications;

F.   introducing the Vehicles into the stream of U.S. commerce without a valid EPA COC and/or CARB EO;

G.   concealing the existence of the emission controls and the unlawfully high emissions from regulators and the public;

H.   persisting in the manufacturing, distribution, and sale of the Vehicles even after questions were raised about the emission testing and discrepancies concerning the same;

I.   misleading government regulators as to the nature of the emission control technology and the defects in the Fraudulent Vehicles;

J.   misleading the driving public as to the nature of the emission control technology and the defects in the Fraudulent Vehicles;

K.   designing and distributing marketing materials that misrepresented and/or concealed the defect in the vehicles;

L.   otherwise misrepresenting or concealing the defective nature of the Fraudulent Vehicles from the public and regulators;

N.    collecting revenues and profits from the sale of such products; and/or

O.    ensuring that the other RICO Defendants and unnamed co-conspirators complied with the scheme or common course of conduct.

236.    VM Italy and VM America also participated in, operated and/or directed the EcoDiesel RICO Enterprise by developing an engine that emits high levels of toxic pollutants, calibrating the emission controls to deactivate or diminish during real-world driving conditions, and providing false or misleading information for purposes of supplying it to regulators on COC and/or EO applications.

237.    Bosch GmbH and Bosch LLC also participated in, operated and/or directed the EcoDiesel® RICO Enterprise.    Bosch formed a partnership with Fiat to provide engine management and emission control technology for the Fraudulent Vehicles. Bosch GmbH and Bosch LLC participated in the fraudulent scheme by manufacturing, installing, testing, modifying, and supplying the EDC Unit 17 for the Vehicles.    Bosch GmbH and Bosch LLC exercised tight control over the coding and other aspects of the software and closely collaborated with Fiat, FCA, VM Italy, and VM America to develop, customize, and calibrate the software for the Vehicles. Additionally, Bosch GmbH and Bosch LLC continuously cooperated with the other RICO Defendants to ensure that the EDC Unit 17 was fully integrated into the Vehicles. Bosch GmbH and Bosch LLC also participated in the affairs of the Enterprise by concealing the software functions from U.S. regulators and actively lobbying regulators on behalf of "clean diesel." Bosch collected millions of dollars in revenues and profits from the hidden software installed in the Vehicles.

238.    Without the RICO Defendants' willing participation, including Bosch GmbH and Bosch LLC's active involvement in developing and supplying the critical emission control

software for the Vehicles, the Enterprise's scheme and common course of conduct would have been unsuccessful.

239.    The RICO Defendants directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiffs cannot fully know at present, because such information lies in the RICO Defendants' or other's hands.

240.    Similarly, because the defendants often refer to themselves as a group (*i.e.,* "Bosch" rather than "Bosch GmbH" and "Bosch LLC"), Plaintiffs cannot fully know the full extent of each individual corporate entity's involvement in the wrongdoing prior to having access to discovery.

### C. Mail and Wire Fraud

241.    To carry out, or attempt to carry out the scheme to defraud, the RICO Defendants, each of whom is a person associated-in-fact with the EcoDiesel® RICO Enterprise, did knowingly conduct or participate, directly or indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and which employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

242.    Specifically, as alleged herein, the RICO Defendants have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (i.e., violations of 18 U.S.C. §§ 1341 and 1343), within the past ten years. The multiple acts of racketeering activity that the RICO Defendants committed, or aided or abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity

was made possible by the RICO Defendants' regular use of the facilities, services, distribution channels, and employees of the EcoDiesel® RICO Enterprise. The RICO Defendants participated in the scheme to defraud by using mail, telephone and the Internet to transmit mailings and wires in interstate or foreign commerce.

243.    The RICO Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments and material omissions.

244.    In devising and executing the illegal scheme, the RICO Defendants devised and knowingly carried out a material scheme and/or artifice to defraud Plaintiffs or to obtain money from Plaintiffs by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts.  For the purpose of executing the illegal scheme, the RICO Defendants committed these racketeering acts which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal scheme.

245.    The RICO Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

A.    Mail Fraud:  The RICO Defendants violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the Fraudulent Vehicles by means of false pretenses, misrepresentations, promises, and omissions.

B.    Wire Fraud: The RICO Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by

wire for the purpose of executing the unlawful scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and omissions.

246.    The RICO Defendants' uses of the mails and wires include, but are not limited to, the transmission, delivery, or shipment of the following by the RICO Defendants or third parties that were foreseeably caused to be sent as a result of Defendants' illegal scheme:

A.    the Fraudulent Vehicles themselves;

B.    component parts for the EcoDiesel® engines;

C.    component parts for the Bosch emission control hardware and software;

D.    false or misleading emission test results;

E.    applications for EPA COCs and CARB EOs that concealed AECDs;

F.    fraudulently-obtained EPA COCs and CARB EOs;

G.    vehicle registrations and plates as a result of the fraudulently-obtained EPA COCs and CARB EOs;

H.    documents and communications that facilitated "passing" emission tests;

I.    false or misleading communications intended to prevent regulators and the public from discovering the true nature of the emission controls and/or AECDs;

J.    sales and marketing materials, including advertising, websites, packaging, brochures, and labeling, concealing the true nature of the Fraudulent Vehicles;

K.    documents intended to facilitate the manufacture and sale of the Fraudulent Vehicles, including bills of lading, invoices, shipping records, reports and correspondence;

L.    documents to process and receive payment for the Fraudulent Vehicles by unsuspecting Plaintiffs, including invoices and receipts;

M.    payments to VM Italy and VM America;

N.    payments to Bosch GmbH and Bosch LLC;

O.    millions of dollars in compensation to Marchionne and Denner;

P.    deposits of proceeds; and/or

Q.    other documents and things, including electronic communications.

247.    The RICO Defendants (or their agents), for the purpose of executing the illegal scheme, sent and/or received (or caused to be sent and/or received) by mail or by private or interstate carrier, shipments of the Fraudulent Vehicles and related documents by mail or a private carrier affecting interstate commerce, including the items described above and alleged below:

| From | To | Date | Description |
|------|-----|------|-------------|
| FCA | Bosch LLC | January 2013 | Documents related to agreement to purchase Bosch EDC Unit 17 for 2014 Jeep Grand Cherokee. |
| VM Motori | FCA | January 2013 | Documents related to Eco Diesel engine for 2014 Jeep Grand Cherokee. |
| FCA, Michigan | FCA Dealership | July 2013 | Marketing Documents for 2014 Ram 1500 Vehicles. |
| EPA | FCA | September 2013 | COC and related documents for 2014 Jeep Grand Cherokee. |
| EPA | FCA | September 2014 | COC and related documents for 2015 Jeep Grand Cherokee. |
| FCA Warren Truck Assembly | Arrigo Dodge Dealership, Sunrise, Florida | November 2015 | Shipment of 2016 Ram 1500 Vehicles. |

248.    The RICO Defendants (or their agents), for the purpose of executing the illegal scheme, transmitted (or caused to be transmitted) in interstate commerce by means of wire communications, certain writings, signs, signals and sounds, including those items described

above and alleged below:

| From | To | Date | Description |
|------|-----|------|-------------|
| Bosch LLC | RP Newswire, New York (and media networks around United States) | January 2013 | Press release that Bosch's "clean diesel" technology will be featured in 2014 Jeep Grand Cherokee. |
| FCA, Michigan | Driving Public Throughout all 50 States | July 2013 | Ram Zone Blog: *The 2014 Ram 1500 with Eco Diesel Engine, Available Soon at a Dealer Near You.* |
| Bosch LLC | FCA | October 2013 | Software and calibration documentation for emission control technology. |
| FCA, Michigan | EPA, Michigan and CARB, California | January 2014 | Certification Summary Information Report with emission test results for 2014 Jeep Grand Cherokee and 2014 Ram 1500. |
| FCA, Michigan | EPA, Michigan and CARB, California | January 2015 | Certification Summary Information Report with emission test results for 2015 Jeep Grand Cherokee and 2015 Ram 1500. |
| FCA, Michigan | EPA Alabama, DC | February 2, 2016 | Email correspondence re: FCA lulling press release concerning compliance of diesel vehicles with applicable emission regulations. |
| EPA, Alabama, DC | FCA, Michigan | November 30, 2016 | Email correspondence re: conference call between EPA officials and Sergio Marchionne. |

249.    The RICO Defendants also used the internet and other electronic facilities to carry out the scheme and conceal their ongoing fraudulent activities.  Specifically, FCA, under the direction and control of Fiat and Marchionne, made misrepresentations about the Fraudulent Vehicles on their websites, YouTube, and through ads online, all of which were intended to mislead regulators and the public about the emission standards and other performance metrics.

83

250.    The RICO Defendants also communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, dealerships and other third-party entities in furtherance of the scheme.

251.    The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct to deceive regulators and consumers and lure consumers into purchasing the Fraudulent Vehicles, which Defendants knew or recklessly disregarded as emitting illegal amounts of pollution, despite their advertising campaign that the Fraudulent Vehicles were "clean" diesel cars.

252.    Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden, and cannot be alleged without access to Defendants' books and records. However, Plaintiffs have described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. These include thousands of communications to perpetuate and maintain the scheme, including the things and documents described in the preceding paragraphs.

253.    The RICO Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), the RICO Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with the RICO Defendants in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues, increase market share, and/or minimize losses for the Defendants and their unnamed co-conspirators throughout the illegal scheme and common course of conduct.

254.    To achieve their common goals, the RICO Defendants hid from the general

84

public the excessive and unlawful emissions of the Fraudulent Vehicles and obfuscated the true nature and level of the emissions even after regulators raised concerns. The RICO Defendants suppressed and/or ignored warnings from third parties, whistleblowers, and governmental entities about the discrepancies in emissions testing and the concealed auxiliary (or defeat) devices present in the Fraudulent Vehicles.

255.    With knowledge and intent, the RICO Defendants and each member of the conspiracy, with knowledge and intent, have agreed to the overall objectives of the conspiracy, and have participated in the common course of conduct, to commit acts of fraud and indecency in designing, manufacturing, distributing, marketing, testing, and/or selling the Fraudulent Vehicles (and the emission control technology contained therein).

256.    Indeed, for the conspiracy to succeed, each of the RICO Defendants and their co-conspirators had to agree to implement and use the similar devices and fraudulent tactics. Specifically, the RICO Defendants committed to secrecy about the concealed AECDs in the Fraudulent Vehicles.

257.    The RICO Defendants knew and intended that government regulators would rely on their material omissions made about the Fraudulent Vehicles to approve them for importation, marketing, and sale in the United States and each state. The RICO Defendants knew and intended that consumers would purchase the Fraudulent Vehicles and incur costs as a result. Plaintiffs' reliance on this ongoing concealment is demonstrated by the fact that they purchased illegal and defective vehicles that never should have been introduced into the U.S. stream of commerce. In addition, the EPA, CARB, and other regulators relied on the misrepresentations and material concealment and omissions made or caused to be made by the RICO Defendants; otherwise, FCA could not have obtained valid COCs and EOs to sell the Fraudulent Vehicles.

258.    As described herein, the RICO Defendants engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from Plaintiffs based on their misrepresentations and omissions, while providing Fraudulent Vehicles that were worth significantly less than the purchase price paid. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

259.    The predicate acts had the purpose of generating significant revenue and profits for the RICO Defendants at the expense of Plaintiffs. The predicate acts were committed or caused to be committed by the RICO Defendants through their participation in the EcoDiesel® RICO Enterprise and in furtherance of its fraudulent scheme, and were interrelated in that they involved obtaining Plaintiffs' funds and avoiding the expenses associated with remediating the Fraudulent Vehicles.

260.    During the design, manufacture, testing, marketing and sale of the Fraudulent Vehicles, the RICO Defendants shared among themselves technical, marketing, and financial information that revealed the existence of the AECDs contained therein. Nevertheless, the RICO Defendants chose and agreed to disseminate information that deliberately misrepresented the Fraudulent Vehicles as legal, "clean," "environmentally friendly," and "fuel efficient" in their concerted efforts to market and sell them to consumers.

261.    By reason of, and as a result of the conduct of the RICO Defendants, and in particular, their pattern of racketeering activity, Plaintiffs have been injured in their business and/or property in multiple ways, including but not limited to:

A.    Purchase or lease of illegal, defective Fraudulent Vehicles;

86

B.    Overpayment at the time of purchase or lease for Fraudulent Vehicles purportedly having "EcoDiesel" properties and benefits, and meeting applicable federal and state emissions standards, that did not have these properties or meet these standards;

C.    The value of the Fraudulent Vehicles has diminished;

D.    Other, ongoing out-of-pocket and loss-of-use expenses;

E.    Payment for alternative transportation; and

F.    Loss of employment due to lack of transportation.

262.    The RICO Defendants' violations of 18 U.S.C. § 1962(c) and (d) have directly and proximately caused economic damage to Plaintiffs' business and property, and Plaintiffs are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## STATE LAW CLAIMS

## ALABAMA

263.    Plaintiff Robert Cooke (the "Alabama Plaintiff") acquired a Fraudulent Vehicle while in the State of Alabama.    As such, the Alabama Plaintiff brings the following causes of action against all defendants.

### ALABAMA COUNT 1- FRAUD
### (On behalf of the Alabama Plaintiff)

264.    The Alabama Plaintiff incorporate by reference each preceding paragraph as though fully set forth herein.

### A.    Affirmative Misrepresentation

265.    The Alabama Plaintiff asserts this affirmative misrepresentation theory of fraud against the Fiat Chrysler Defendants and VM Motori Defendants.

266.    Fiat Chrysler branded each Fraudulent Vehicle with the EcoDiesel badge.

87

Through the badge, Fiat Chrysler communicated to the Alabama Plaintiff that the Fraudulent Vehicles were, among other things, environmentally friendly.

267.    This was a material fact, as Fiat Chrysler's own research and communications demonstrate. Fiat Chrysler's representations were false because the Fraudulent Vehicles contain undisclosed emission cheating components that cause them to pollute excessively in real-world driving conditions.

268.    Fiat Chrysler and VM Motori knew the representations were false and intended the Alabama Plaintiff to rely on them.

269.    The Alabama Plaintiff decided to acquire the Fraudulent Vehicle based in part on the representations communicated through the EcoDiesel badge, and they relied on such representations to their detriment.

### B.    Fraudulent Concealment: Fuel Economy and Performance Representations

270.    The Alabama Plaintiff asserts this fraudulent concealment theory against all Defendants.

271.    Again, Fiat Chrysler branded each Fraudulent Vehicle with the EcoDiesel badge, which communicated not only that the Fraudulent Vehicles were environmentally friendly, but also that they were fuel efficient.

272.    The fuel economy and performance representations were also the centerpiece of Fiat Chrysler's marketing efforts and featured prominently in virtually every advertisement and consumer communication. As detailed above, through dealership training materials leading to representations at the point of sale, vehicle brochures, the manufacturer websites, print advertisements, television advertisements, and other avenues, Fiat Chrysler pervasively and consistently represented that the Fraudulent Vehicles had best in class fuel economy and touted

their specific MPG and range, as well as their supposedly superior torque and performance.

273.     Defendants concealed and suppressed the fact that the Fraudulent Vehicles could achieve their fuel efficiency and power only through undisclosed cheating components that cause them to pollute excessively.  This was a material fact about which the Defendants had knowledge, and that they concealed from the Alabama Plaintiff to mislead the Alabama Plaintiff.

274.     The Alabama Plaintiff did not know this fact and could not have discovered it through reasonably diligent investigation.

275.     Defendants had a duty to disclose that the emission treatment technology in the Fraudulent Vehicles is de-activated or reduced under real-world driving conditions because (1) the Defendants had exclusive knowledge of the material, suppressed facts; (2) the Defendants took affirmative actions to conceal the material facts, including by not identifying them for the EPA and CARB; and (3) Fiat Chrysler made partial representations about the environmental friendliness, fuel economy, and performance of the Fraudulent Vehicles that were misleading without disclosure of the fact that the Fraudulent Vehicles contained hidden emission cheating components that caused the Fraudulent Vehicles to pollute excessively in real-world driving conditions.

276.     The Alabama Plaintiff decided to acquire the Fraudulent Vehicle based in part on the representations communicated through the EcoDiesel badge and other consistent and pervasive consumer communications concerning fuel economy and efficiency, and they relied on such representations to their detriment.

C.     **Fraudulent Concealment: Installing and Concealing the Defeat Devices**

277.     The Alabama Plaintiff asserts this fraudulent concealment theory against all Defendants.

89

278.    Each Defendant committed fraud by installing and calibrating emission control devices in the Fraudulent Vehicles, which were unlawfully concealed from regulators and consumers alike. In uniform advertising and materials provided with each Fraudulent Vehicle, the Fiat Chrysler Defendants concealed from the Alabama Plaintiff that the emission treatment technology de-activated under real-world driving conditions.

279.    The Fiat Chrysler Defendants intentionally concealed, suppressed, and failed to disclose the facts that the Fraudulent Vehicles had defective emission controls and/or emitted unlawfully high levels of pollutants such as NOx. These Defendants, along with VM Motori and the Bosch Defendants, knew or should have known the true facts, due to their involvement in the design, installment, and calibration of the emission treatment technology in the Fraudulent Vehicles. And yet, at no time did any of these Defendants reveal the truth to the Alabama Plaintiff. To the contrary, each Defendant concealed the truth, intending for the Alabama Plaintiff to rely— which the Alabama Plaintiff did.

280.    A reasonable consumer would not have expected that the emission treatment technology in the Fraudulent Vehicles de-activated under real-world driving conditions or that the Fraudulent Vehicles would spew unmitigated NOx during city or highway driving. The Alabama Plaintiff did not know of the facts which were concealed from the Alabama Plaintiff by Defendants. Moreover, as a consumer, the Alabama Plaintiff did not, and could not, unravel the deception on his own.

281.    Defendants had a duty to disclose that the emission treatment technology is de-activated under real-world driving conditions and that the Fraudulent Vehicles spewed unmitigated NOx during real-world conditions. Defendants had such a duty because the true facts were known and/or accessible only to them and because they knew these facts were not known to or reasonably

discoverable by Plaintiffs.

282.    Fiat Chrysler and VM Motori also had a duty to disclose the true nature of the emission controls in light of their statements about the qualities of the EcoDiesel® engines and the Fraudulent Vehicles' emissions levels, which were misleading, deceptive, and incomplete without the disclosure of the fact that the emission treatment technology is de-activated under real-world driving conditions and that the Fraudulent Vehicles spewed unmitigated NOx during real-world conditions. Fiat Chrysler held out the Fraudulent Vehicles as reduced emission diesel vehicles, when in fact, they were unlawfully high emission vehicles. Having volunteered to provide information to the Alabama Plaintiff, Fiat Chrysler and VM Motori had the duty to disclose the whole truth. On information and belief, Fiat Chrysler has still not made full and adequate disclosures and continues to defraud the Alabama Plaintiff by concealing material information regarding the emissions qualities of the Fraudulent Vehicle.

283.    But for Defendants' fraud, the Alabama Plaintiff would not have acquired the Fraudulent Vehicle, or would have paid less for it. The Alabama Plaintiff has sustained damage because he acquired a vehicle that was not as represented and because he owns a Fraudulent Vehicle that should never have been placed in the stream of commerce and is diminished in value as a result of Defendants' fraud. Accordingly, Defendants are liable to the Alabama Plaintiff for damages in an amount to be proven at trial.

284.    The Alabama Plaintiff hereby sue Defendants for damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be proven at trial. Defendants engaged in fraud that was malicious, oppressive, or gross and the statements were made recklessly without regard to their truth and without caring or knowing if they were true or

not. Defendants' conduct thus warrants substantial exemplary damages in an amount to be determined at trial, which the Alabama Plaintiff hereby sues for.

### ALABAMA COUNT 2-
### VIOLATIONS OF ALABAMA DECEPTIVE TRADE PRACTICES ACT
#### (Ala. Code § 8-19-1, *et seq.*)
#### (On behalf of the Alabama Plaintiff)

285.    The Alabama Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

286.    The Alabama Plaintiff has complied with all applicable pre-suit notice letter provisions, if any, including those of the Alabama Deceptive Trade Practices Act.

287.    The Alabama Plaintiff is a "consumer" within the meaning of Ala. Code § 8-19-3(2).

288.    The Alabama Plaintiff and Defendants are "persons" within the meaning of Ala. Code § 8-19-3(5).

289.    The Fraudulent Vehicles are "goods" within the meaning of Ala. Code § 8-19-3(3).

290.    Defendants were and are engaged in "trade or commerce" within the meaning of Ala. Code § 8-19-3(8).

291.    The Alabama Deceptive Trade Practices Act ("Alabama DTPA") declares several specific actions to be unlawful, including: "(2) Causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services; (5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have," "(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another," and "(27) Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." Ala. Code § 8-19-5.

292.    In the course of their business, through their agents, employees, and/or subsidiaries, violated the Alabama DTPA.

293.    As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Fraudulent Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Fraudulent Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Fraudulent Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Fraudulent Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Fraudulent Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and the Alabama Plaintiff alike. In so doing, and by marketing, offering for sale, and selling the defective Fraudulent Vehicles, Defendants violated the Alabama DTPA

294.    Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to the Alabama Plaintiff, as Defendants intended. Had they known the truth, the Alabama Plaintiff would not have acquired the Fraudulent Vehicle, or—if the Fraudulent Vehicles' true nature had been disclosed and mitigated—would have paid significantly less for them. The Alabama Plaintiff suffered ascertainable loss and actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material

information. The Alabama Plaintiff also suffered diminished value of the vehicle, as well as lost or diminished use.

295. The Alabama Plaintiff had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. The Alabama Plaintiff did not, and could not, unravel Defendants' deception on their own.

296. Defendants had an ongoing duty to the Alabama Plaintiff to refrain from unfair and deceptive practices under the Alabama DTPA in the course of their business. Specifically, Defendants owed the Alabama Plaintiff a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from the Alabama Plaintiff, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

297. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Alabama Plaintiff, about the true environmental cleanliness and efficiency of the Fraudulent Vehicles, the quality of the Defendants' brands, the devaluing of environmental cleanliness and integrity of Defendants, and the true value of the Fraudulent Vehicles.

298. Defendants' violations present a continuing risk to the Alabama Plaintiff as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

299. Pursuant to Ala. Code § 8-19-10, the Alabama Plaintiff hereby sues Defendants for actual damages, including economic and non-economic damages (including, without limitation,

damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be determined at trial.  The Alabama Plaintiff also hereby sues Defendants for three times the amount of actual damages plus attorneys' fees and costs per Ala. Code § 8-19-10 plus any other just and proper relief available under the Ala. Code § 8-19-1, *et seq.*

## GEORGIA

300.    Plaintiffs Frank Roach, Jeff Gaskins and Adam Garner (collectively, the "Georgia Plaintiffs") acquired their Fraudulent Vehicles while in the State of Georgia.  As such, they bring the following causes of action against all defendants.

### GEORGIA COUNT 1- FRAUD
### (On behalf of the Georgia Plaintiffs)

301.    The Georgia Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

### A.    Affirmative Misrepresentation

302.    The Georgia Plaintiffs assert this affirmative misrepresentation theory of fraud on behalf of themselves against the Fiat Chrysler Defendants and VM Motori Defendants.

303.    Fiat Chrysler branded each Fraudulent Vehicle with the EcoDiesel badge. Through the badge, Fiat Chrysler communicated to each of the Georgia Plaintiffs that the Fraudulent Vehicles were, among other things, environmentally friendly.

304.    This was a material fact, as Fiat Chrysler's own research and communications demonstrate. Fiat Chrysler's representations were false because the Fraudulent Vehicles contain undisclosed emission cheating components that cause them to pollute excessively in real-world driving conditions.

305.    Fiat Chrysler and VM Motori knew the representations were false and intended the Georgia Plaintiffs to rely on them.

306.    The Georgia Plaintiffs decided to acquire their Fraudulent Vehicles based in part on the representations communicated through the EcoDiesel badge, and they relied on such representations to their detriment.

**B.    Fraudulent Concealment: Fuel Economy and Performance Representations**

307.    The Georgia Plaintiffs assert this fraudulent concealment theory against all Defendants.

308.    Again, Fiat Chrysler branded each Fraudulent Vehicle with the EcoDiesel badge, which communicated not only that the Fraudulent Vehicles were environmentally friendly, but also that they were fuel efficient.

309.    The fuel economy and performance representations were also the centerpiece of Fiat Chrysler's marketing efforts and featured prominently in virtually every advertisement and consumer communication.  As detailed above, through dealership training materials leading to representations at the point of sale, vehicle brochures, the manufacturer websites, print advertisements, television advertisements, and other avenues, Fiat Chrysler pervasively and consistently represented that the Fraudulent Vehicles had best in class fuel economy and touted their specific MPG and range, as well as their supposedly superior torque and performance.

310.    Defendants concealed and suppressed the fact that the Fraudulent Vehicles could achieve their fuel efficiency and power only through undisclosed cheating components that cause them to pollute excessively.  This was a material fact about which the Defendants had knowledge, and that they concealed from the Georgia Plaintiffs to mislead them.

311.    The Georgia Plaintiffs did not know this fact and could not have discovered it through reasonably diligent investigation.

312.    Defendants had a duty to disclose that the emission treatment technology in the

Fraudulent Vehicles is de-activated or reduced under real-world driving conditions because (1) the Defendants had exclusive knowledge of the material, suppressed facts; (2) the Defendants took affirmative actions to conceal the material facts, including by not identifying them for the EPA and CARB; and (3) Fiat Chrysler made partial representations about the environmental friendliness, fuel economy, and performance of the Fraudulent Vehicles that were misleading without disclosure of the fact that the Fraudulent Vehicles contained hidden emission cheating components that caused the Fraudulent Vehicles to pollute excessively in real-world driving conditions.

313.    The Georgia Plaintiffs decided to acquire their Fraudulent Vehicles based in part on the representations communicated through the EcoDiesel badge and other consistent and pervasive consumer communications concerning fuel economy and efficiency, and they relied on such representations to their detriment.

### C.    Fraudulent Concealment: Installing and Concealing the Defeat Devices

314.    The Georgia Plaintiffs assert this fraudulent concealment theory against all Defendants.

315.    Each Defendant committed fraud by installing and calibrating emission control devices in the Fraudulent Vehicles, which were unlawfully concealed from regulators and consumers alike. In uniform advertising and materials provided with each Fraudulent Vehicle, the Fiat Chrysler Defendants concealed from the Georgia Plaintiffs that the emission treatment technology de-activated under real-world driving conditions.

316.    The Fiat Chrysler Defendants intentionally concealed, suppressed, and failed to disclose the facts that the Fraudulent Vehicles had defective emission controls and/or emitted unlawfully high levels of pollutants such as NOx. These Defendants, along with VM Motori and

the Bosch Defendants, knew or should have known the true facts, due to their involvement in the design, installment, and calibration of the emission treatment technology in the Fraudulent Vehicles. And yet, at no time did any of these Defendants reveal the truth to the Georgia Plaintiffs. To the contrary, each Defendant concealed the truth, intending for the Georgia Plaintiffs to rely - which they did.

317.     A reasonable consumer would not have expected that the emission treatment technology in the Fraudulent Vehicles de-activated under real-world driving conditions or that the Fraudulent Vehicles would spew unmitigated NOx during city or highway driving. The Georgia Plaintiffs did not know of the facts which were concealed from them by Defendants. Moreover, as consumers, the Georgia Plaintiffs did not, and could not, unravel the deception on their own.

318.     Defendants had a duty to disclose that the emission treatment technology is de-activated under real-world driving conditions and that the Fraudulent Vehicles spewed unmitigated NOx during real-world conditions. Defendants had such a duty because the true facts were known and/or accessible only to them and because they knew these facts were not known to or reasonably discoverable by Plaintiffs.

319.     Fiat Chrysler and VM Motori also had a duty to disclose the true nature of the emission controls in light of their statements about the qualities of the EcoDiesel® engines and the Fraudulent Vehicles' emissions levels, which were misleading, deceptive, and incomplete without the disclosure of the fact that the emission treatment technology is de-activated under real-world driving conditions and that the Fraudulent Vehicles spewed unmitigated NOx during real-world conditions. Fiat Chrysler held out the Fraudulent Vehicles as reduced emission diesel vehicles, when in fact, they were unlawfully high emission vehicles. Having volunteered to provide information to the Georgia Plaintiffs, Fiat Chrysler and VM Motori had the duty to disclose the

whole truth.   On information and belief, Fiat Chrysler has still not made full and adequate disclosures and continues to defraud the Georgia Plaintiffs by concealing material information regarding the emissions qualities of the Fraudulent Vehicles.

320.     But for Defendants' fraud, the Georgia Plaintiffs would not have purchased the Fraudulent Vehicles, or would have paid less for them.   The Georgia Plaintiffs have sustained damage because they acquired vehicles that were not as represented and because they own Fraudulent Vehicles that should never have been placed in the stream of commerce and are diminished in value as a result of Defendants' fraud.   Accordingly, Defendants are liable to the Georgia Plaintiffs for damages in an amount to be proven at trial.

321.     Defendants are liable to the Georgia Plaintiffs for damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be proven at trial, for which the Georgia Plaintiffs hereby sue Defendants.   Defendants' actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care that would raise the presumption of conscious indifference to consequences. Defendants' conduct thus warrants the award of substantial punitive damages in an amount to be determined at trial, for which the Georgia Plaintiffs hereby sue Defendants.

### GEORGIA COUNT 2-
### VIOLATIONS OF GEORGIA'S FAIR BUSINESS PRACTICES ACT
#### (Ga. Code Ann. § 10-1-390, *et seq.*)
#### (On behalf of the Georgia Plaintiffs)

322.     The Georgia Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

323.     The Georgia Plaintiffs have complied with all applicable, pre-suit notice letter provisions, if any, including those of the Georgia Fair Business Practices Act.

324.    The Georgia Fair Business Practices Act ("Georgia FBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, Ga. Code. Ann. § 10-1-393(a), including but not limited to "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade ... if they are of another," and "[a]dvertising goods or services with intent not to sell them as advertised," Ga. Code. Ann. § 10-1-393(b). Defendants intentionally violated the aforementioned provisions of the Georgia FBPA.

325.    In the course of their business, through their agents, employees, and/or subsidiaries, Defendants violated the Georgia FBPA.

326.    As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Fraudulent Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Fraudulent Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Fraudulent Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Fraudulent Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Fraudulent Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and the Georgia Plaintiffs alike. In so doing, and by marketing, offering for sale, and selling the defective Fraudulent Vehicles, Defendants violated the Georgia FBPA

327.    Defendants' scheme and concealment of the true characteristics of the EcoDiesel®️ emission control system were material to the Georgia Plaintiffs, as Defendants intended. Had they known the truth, the Georgia Plaintiffs would not have acquired the Fraudulent Vehicles, or—if the Fraudulent Vehicles' true nature had been disclosed and mitigated—would have paid significantly less for them. The Georgia Plaintiffs suffered ascertainable loss and actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. The Georgia Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

328.    The Georgia Plaintiffs had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. The Georgia Plaintiffs did not, and could not, unravel Defendants' deception on their own.

329.    Defendants had an ongoing duty to the Georgia Plaintiffs to refrain from unfair and deceptive practices under the Georgia FBPA in the course of their business.  Specifically, Defendants owed the Georgia Plaintiffs a duty to disclose all the material facts concerning the EcoDiesel®️ emission control system because they possessed exclusive knowledge, they intentionally concealed it from the Georgia Plaintiffs, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

330.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Georgia Plaintiffs, about the true

environmental cleanliness and efficiency of the Fraudulent Vehicles, the quality of the Defendants' brands, the devaluing of environmental cleanliness and integrity of Defendants, and the true value of the Fraudulent Vehicles.

331.    Defendants' violations present a continuing risk to the Georgia Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

332.    The Georgia Plaintiffs are entitled to recover, and hereby sue Defendants for, actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) plus attorney's fees and expenses of litigation per Ga. Code Ann. § 10-1-399(d) plus exemplary damages (for intentional violations) per Ga. Code. Ann. § 10-1-399(a). The Georgia Plaintiffs also sue Defendants for any other just and proper relief available under the Georgia FBPA per Ga. Code. Ann. § 10-1-399.

### ILLINOIS

333.    Plaintiff John Pora (the "Illinois Plaintiff") acquired their Fraudulent Vehicle while in the State of Illinois.   As such, they bring the following causes of action against all defendants.

### ILLINOIS COUNT 1- FRAUD
### (On behalf of the Illinois Plaintiff)

334.    The Illinois Plaintiff incorporate by reference each preceding paragraph as though fully set forth herein.

#### A.    Affirmative Misrepresentation

335.    The Illinois Plaintiff assert this affirmative misrepresentation theory of fraud on behalf of themselves against the Fiat Chrysler Defendants and VM Motori Defendants.

336.    Fiat Chrysler branded each Fraudulent Vehicle with the Ecodiesel badge. Through

the badge, Fiat Chrysler communicated to each of the Illinois Plaintiff that the Fraudulent Vehicles were, among other things, environmentally friendly.

337.    This was a material fact, as Fiat Chrysler's own research and communications demonstrate. Fiat Chrysler's representations were false because the Fraudulent Vehicles contain undisclosed emission cheating components that cause them to pollute excessively in real-world driving conditions.

338.    Fiat Chrysler and VM Motori knew the representations were false and intended the Illinois Plaintiff to rely on them.

339.    The Illinois Plaintiff decided to acquire their Fraudulent Vehicle based in part on the representations communicated through the Ecodiesel badge, and they relied on such representations to their detriment.

**B.    Fraudulent Concealment: Fuel Economy and Performance Representations**

340.    The Illinois Plaintiff assert this fraudulent concealment theory against all Defendants.

341.    Again, Fiat Chrysler branded each Fraudulent Vehicle with the Ecodiesel badge, which communicated not only that the Fraudulent Vehicles were environmentally friendly, but also that they were fuel efficient.

342.    The fuel economy and performance representations were also the centerpiece of Fiat Chrysler's marketing efforts and featured prominently in virtually every advertisement and consumer communication. As detailed above, through dealership training materials leading to representations at the point of sale, vehicle brochures, the manufacturer websites, print advertisements, television advertisements, and other avenues, Fiat Chrysler pervasively and consistently represented that the Fraudulent Vehicles had best in class fuel economy and touted

their specific MPG and range, as well as their supposedly superior torque and performance.

343.    Defendants concealed and suppressed the fact that the Fraudulent Vehicles could achieve their fuel efficiency and power only through undisclosed cheating components that cause them to pollute excessively. This was a material fact about which the Defendants had knowledge, and that they concealed from the Illinois Plaintiff to mislead them.

344.    The Illinois Plaintiff did not know this fact and could not have discovered it through reasonably diligent investigation.

345.    Defendants had a duty to disclose that the emission treatment technology in the Fraudulent Vehicles is de-activated or reduced under real-world driving conditions because (1) the Defendants had exclusive knowledge of the material, suppressed facts; (2) the Defendants took affirmative actions to conceal the material facts, including by not identifying them for the EPA and CARB; and (3) Fiat Chrysler made partial representations about the environmental friendliness, fuel economy, and performance of the Fraudulent Vehicles that were misleading without disclosure of the fact that the Fraudulent Vehicles contained hidden emission cheating components that caused the Fraudulent Vehicles to pollute excessively in real-world driving conditions.

346.    The Illinois Plaintiff decided to acquire their Fraudulent Vehicle based in part on the representations communicated through the Ecodiesel badge and other consistent and pervasive consumer communications concerning fuel economy and efficiency, and they relied on such representations to their detriment.

C.    **Fraudulent Concealment: Installing and Concealing the Defeat Devices**

347.    The Illinois Plaintiff assert this fraudulent concealment theory against all Defendants.

348.    Each Defendant committed fraud by installing and calibrating emission control devices in the Fraudulent Vehicles, which were unlawfully concealed from regulators and consumers alike. In uniform advertising and materials provided with each Fraudulent Vehicle, the Fiat Chrysler Defendants concealed from the Illinois Plaintiff that the emission treatment technology de-activated under real-world driving conditions.

349.    The Fiat Chrysler Defendants intentionally concealed, suppressed, and failed to disclose the facts that the Fraudulent Vehicles had defective emission controls and/or emitted unlawfully high levels of pollutants such as NOx. These Defendants, along with VM Motori and the Bosch Defendants, knew or should have known the true facts, due to their involvement in the design, installment, and calibration of the emission treatment technology in the Fraudulent Vehicles. And yet, at no time did any of these Defendants reveal the truth to the Illinois Plaintiff. To the contrary, each Defendant concealed the truth, intending for the Illinois Plaintiffs to rely— which they did.

350.    A reasonable consumer would not have expected that the emission treatment technology in the Fraudulent Vehicles de-activated under real-world driving conditions or that the Fraudulent Vehicles would spew unmitigated NOx during city or highway driving. The Illinois Plaintiff did not know of the facts which were concealed from them by Defendants. Moreover, as consumers, the Illinois Plaintiff did not, and could not, unravel the deception on their own.

351.    Defendants had a duty to disclose that the emission treatment technology is de-activated under real-world driving conditions and that the Fraudulent Vehicles spewed unmitigated NOx during real-world conditions. Defendants had such a duty because the true facts were known and/or accessible only to them and because they knew these facts were not known to or reasonably discoverable by Plaintiff.

352.    Fiat Chrysler and VM Motori also had a duty to disclose the true nature of the emission controls in light of their statements about the qualities of the Ecodiesel® engines and the Fraudulent Vehicles' emissions levels, which were misleading, deceptive, and incomplete without the disclosure of the fact that the emission treatment technology is de-activated under real-world driving conditions and that the Fraudulent Vehicles spewed unmitigated NOx during real-world conditions. Fiat Chrysler held out the Fraudulent Vehicles as reduced emission diesel vehicles, when in fact, they were unlawfully high emission vehicles. Having volunteered to provide information to the Illinois Plaintiff, Fiat Chrysler and VM Motori had the duty to disclose the whole truth. On information and belief, Fiat Chrysler has still not made full and adequate disclosures and continues to defraud the Illinois Plaintiff by concealing material information regarding the emissions qualities of the Fraudulent Vehicles.

353.    But for Defendants' fraud, the Illinois Plaintiff would not have purchased the Fraudulent Vehicles, or would have paid less for them. The Illinois Plaintiff have sustained damage because they acquired vehicles that were not as represented and because they own Fraudulent Vehicles that should never have been placed in the stream of commerce and are diminished in value as a result of Defendants' fraud. Accordingly, Defendants are liable to the Illinois Plaintiffs for damages in an amount to be proven at trial.

354.    Defendants are liable to the Illinois Plaintiff for damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be proven at trial. Defendants' conduct was fraudulent, intentional, willful and wanton and proximately caused damage to the Illinois Plaintiff. Further, justice and the public good require that the Illinois Plaintiff be awarded an amount of money which will punish Defendants and discourage

Defendants and others from similar conduct. Defendants' conduct thus warrants the award of substantial punitive and exemplary damages in an amount to be determined at trial.

**ILLINOIS COUNT 2-**
**VIOLATIONS OF ILLINOIS CONSUMER FRAUD AND**
**DECEPTIVE BUSINESS PRACTICES ACT**
**(815 ILCS 505/1, *et seq.* and 720 ILCS 295/1a)**
**(On behalf of the Illinois Plaintiff)**

355. The Illinois Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

356. The Illinois Plaintiff has complied with all applicable, pre-suit notice letter provisions, if any, including those of the Illinois Consumer Fraud and Deceptive Business Practices Act. Specifically, the Illinois Plaintiff have served a notice and demand upon named defendants at least 30 days prior to the filing of this action.

357. Defendants are "person[s]" as that term is defined in 815 ILCS 505/1(c).

358. . The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact ... in the conduct of trade or commerce ... whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2. Defendants intentionally violated the Illinois CFA.

359. In the course of their business, through their agents, employees, and/or subsidiaries, Defendants violated the Illinois CFA.

360. As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively

107

misrepresented the environmental friendliness and emissions of the Fraudulent Vehicles through the Ecodiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Fraudulent Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the Ecodiesel badge and uniform and pervasive consumer communications, the Fraudulent Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Fraudulent Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Fraudulent Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and the Illinois Plaintiff alike. In so doing, and by marketing, offering for sale, and selling the defective Fraudulent Vehicles, Defendants violated the Illinois CFA

361.    Defendants' scheme and concealment of the true characteristics of the Ecodiesel® emission control system were material to the Illinois Plaintiff, as Defendants intended. Had they known the truth, the Illinois Plaintiff would not have acquired the Fraudulent Vehicle, or—if the Fraudulent Vehicles' true nature had been disclosed and mitigated—would have paid significantly less for them. The Illinois Plaintiff suffered ascertainable loss and actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. The Illinois Plaintiff also suffered diminished value of their vehicle, as well as lost or diminished use.

362.    The Illinois Plaintiff had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. The Illinois Plaintiffs did not, and could not, unravel Defendants' deception on their own.

363.    Defendants had an ongoing duty to the Illinois Plaintiff to refrain from unfair and deceptive practices under the Illinois CFA in the course of their business. Specifically, Defendants owed the Illinois Plaintiff a duty to disclose all the material facts concerning the Ecodiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from the Illinois Plaintiff, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

364.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Illinois Plaintiff, about the true environmental cleanliness and efficiency of the Fraudulent Vehicles, the quality of the Defendants' brands, the devaluing of environmental cleanliness and integrity of Defendants, and the true value of the Fraudulent Vehicles.

365.    Defendants' violations present a continuing risk to the Illinois Plaintiff as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

366.    Pursuant to 815 ILCS 505/10a(a), the Illinois Plaintiff sues Defendants for actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) plus punitive damages because Defendants acted with fraud and/or malice and/or was grossly negligent

and their conduct was willful or intentional and done with evil motive or reckless indifference to the rights of others. Defendants' conduct resulted in public injury constituted a pattern or an effect on consumers and the public interest. The Illinois Plaintiff also seeks attorney's fees and costs per 815 ILCS § 505/10a(c) plus any other just and proper relief available under the Illinois CFA.

## MISSOURI

367.    Plaintiffs Matthew Williams and Paul Williams (collectively, the "Missouri Plaintiffs") acquired their Fraudulent Vehicle while in the State of Missouri. As such, they bring the following causes of action against all defendants.

## MISSOURI COUNT 1- FRAUD
### (On behalf of the Missouri Plaintiffs)

368.    The Missouri Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

### A.    Affirmative Misrepresentation

369.    The Missouri Plaintiffs assert this affirmative misrepresentation theory of fraud on behalf of themselves against the Fiat Chrysler Defendants and VM Motori Defendants.

370.    Fiat Chrysler branded each Fraudulent Vehicle with the Ecodiesel badge. Through the badge, Fiat Chrysler communicated to each of the Missouri Plaintiffs that the Fraudulent Vehicles were, among other things, environmentally friendly.

371.    This was a material fact, as Fiat Chrysler's own research and communications demonstrate. Fiat Chrysler's representations were false because the Fraudulent Vehicles contain undisclosed emission cheating components that cause them to pollute excessively in real-world driving conditions.

372.    Fiat Chrysler and VM Motori knew the representations were false and intended the Missouri Plaintiffs to rely on them.

**110**

373.     The Missouri Plaintiffs decided to acquire their Fraudulent Vehicle based in part on the representations communicated through the Ecodiesel badge, and they relied on such representations to their detriment.

**B.     Fraudulent Concealment: Fuel Economy and Performance Representations**

374.     The Missouri Plaintiffs assert this fraudulent concealment theory against all Defendants.

375.     Again, Fiat Chrysler branded each Fraudulent Vehicle with the Ecodiesel badge, which communicated not only that the Fraudulent Vehicles were environmentally friendly, but also that they were fuel efficient.

376.     The fuel economy and performance representations were also the centerpiece of Fiat Chrysler's marketing efforts and featured prominently in virtually every advertisement and consumer communication.  As detailed above, through dealership training materials leading to representations at the point of sale, vehicle brochures, the manufacturer websites, print advertisements, television advertisements, and other avenues, Fiat Chrysler pervasively and consistently represented that the Fraudulent Vehicles had best in class fuel economy and touted their specific MPG and range, as well as their supposedly superior torque and performance.

377.     Defendants concealed and suppressed the fact that the Fraudulent Vehicles could achieve their fuel efficiency and power only through undisclosed cheating components that cause them to pollute excessively.  This was a material fact about which the Defendants had knowledge, and that they concealed from the Missouri Plaintiffs to mislead them.

378.     The Missouri Plaintiffs did not know this fact and could not have discovered it through reasonably diligent investigation.

379.     Defendants had a duty to disclose that the emission treatment technology in the

Fraudulent Vehicles is de-activated or reduced under real-world driving conditions because (1) the Defendants had exclusive knowledge of the material, suppressed facts; (2) the Defendants took affirmative actions to conceal the material facts, including by not identifying them for the EPA and CARB; and (3) Fiat Chrysler made partial representations about the environmental friendliness, fuel economy, and performance of the Fraudulent Vehicles that were misleading without disclosure of the fact that the Fraudulent Vehicles contained hidden emission cheating components that caused the Fraudulent Vehicles to pollute excessively in real-world driving conditions.

380.　　The Missouri Plaintiffs decided to acquire their Fraudulent Vehicle based in part on the representations communicated through the Ecodiesel badge and other consistent and pervasive consumer communications concerning fuel economy and efficiency, and they relied on such representations to their detriment.

## C.　Fraudulent Concealment: Installing and Concealing the Defeat Devices

381.　　The Missouri Plaintiffs assert this fraudulent concealment theory against all Defendants.

382.　　Each Defendant committed fraud by installing and calibrating emission control devices in the Fraudulent Vehicles, which were unlawfully concealed from regulators and consumers alike. In uniform advertising and materials provided with each Fraudulent Vehicle, the Fiat Chrysler Defendants concealed from the Missouri Plaintiffs that the emission treatment technology de-activated under real-world driving conditions.

383.　　The Fiat Chrysler Defendants intentionally concealed, suppressed, and failed to disclose the facts that the Fraudulent Vehicles had defective emission controls and/or emitted unlawfully high levels of pollutants such as NOx. These Defendants, along with VM Motori and

the Bosch Defendants, knew or should have known the true facts, due to their involvement in the design, installment, and calibration of the emission treatment technology in the Fraudulent Vehicles. And yet, at no time did any of these Defendants reveal the truth to the Missouri Plaintiffs. To the contrary, each Defendant concealed the truth, intending for the Missouri Plaintiffs to rely—which they did.

384.    A reasonable consumer would not have expected that the emission treatment technology in the Fraudulent Vehicles de-activated under real-world driving conditions or that the Fraudulent Vehicles would spew unmitigated NOx during city or highway driving. The Missouri Plaintiffs did not know of the facts which were concealed from them by Defendants. Moreover, as consumers, the Missouri Plaintiffs did not, and could not, unravel the deception on their own.

385.    Defendants had a duty to disclose that the emission treatment technology is de-activated under real-world driving conditions and that the Fraudulent Vehicles spewed unmitigated NOx during real-world conditions. Defendants had such a duty because the true facts were known and/or accessible only to them and because they knew these facts were not known to or reasonably discoverable by Plaintiffs.

386.    Fiat Chrysler and VM Motori also had a duty to disclose the true nature of the emission controls in light of their statements about the qualities of the Ecodiesel® engines and the Fraudulent Vehicles' emissions levels, which were misleading, deceptive, and incomplete without the disclosure of the fact that the emission treatment technology is de-activated under real-world driving conditions and that the Fraudulent Vehicles spewed unmitigated NOx during real-world conditions. Fiat Chrysler held out the Fraudulent Vehicles as reduced emission diesel vehicles, when in fact, they were unlawfully high emission vehicles. Having volunteered to provide information to the Missouri Plaintiffs, Fiat Chrysler and VM Motori had the duty to disclose the

whole truth. On information and belief, Fiat Chrysler has still not made full and adequate disclosures and continues to defraud the Missouri Plaintiffs by concealing material information regarding the emissions qualities of the Fraudulent Vehicles.

387. But for Defendants' fraud, the Missouri Plaintiffs would not have purchased the Fraudulent Vehicle, or would have paid less for it. The Missouri Plaintiffs have sustained damage because they acquired vehicles that were not as represented and because they own Fraudulent Vehicles that should never have been placed in the stream of commerce and are diminished in value as a result of Defendants' fraud. Accordingly, Defendants are liable to the Missouri Plaintiffs for damages in an amount to be proven at trial.

388. Defendants are liable to the Missouri Plaintiffs for damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be proven at trial, for which the Missouri Plaintiffs hereby sue. Defendants' conduct was outrageous because of Defendants' evil motive or reckless indifference to the rights of others. Defendants' conduct thus warrants the award of substantial punitive and exemplary damages in an amount to be determined at trial, for which the Missouri Plaintiff hereby sue.

### MISSOURI COUNT 2-
### VIOLATIONS OF MISSOURI MERCHANDISING PRACTICES ACT
#### (Mo. Rev. Stat. § 407.010, *et seq*.)
#### (On behalf of the Missouri Plaintiffs)

389. The Missouri Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

390. The Missouri Plaintiffs have complied with all applicable, pre-suit notice letter provisions, if any.

391.    Defendants and the Missouri Plaintiffs are "persons" within the meaning of MO. REV. STAT. § 407.010(5).

392.    Defendants engaged in "trade" or "commerce" in the State of Missouri within the meaning of Mo. Rev. Stat. § 407.010(7).

393.    The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise." Mo. Rev. Stat. § 407.020.

394.    In the course of their business, through their agents, employees, and/or subsidiaries, Defendants violated the Missouri MPA.

395.    As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Fraudulent Vehicles through the Ecodiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Fraudulent Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the Ecodiesel badge and uniform and pervasive consumer communications, the Fraudulent Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Fraudulent Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Fraudulent Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and the Missouri Plaintiffs alike. In so doing, and by marketing, offering for sale, and selling the defective Fraudulent Vehicles, Defendants violated the Missouri MPA

396.    Defendants' scheme and concealment of the true characteristics of the Ecodiesel® emission control system were material to the Missouri Plaintiffs, as Defendants intended. Had they known the truth, the Missouri Plaintiffs would not have acquired the Fraudulent Vehicle, or—if the Fraudulent Vehicles' true nature had been disclosed and mitigated—would have paid significantly less for it. The Missouri Plaintiffs suffered ascertainable loss and actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. The Missouri Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

397.    The Missouri Plaintiffs had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. The Missouri Plaintiffs did not, and could not, unravel Defendants' deception on their own.

398.    Defendants had an ongoing duty to the Missouri Plaintiffs to refrain from unfair and deceptive practices under the Missouri MPA in the course of their business.  Specifically, Defendants owed the Missouri Plaintiffs a duty to disclose all the material facts concerning the Ecodiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from the Missouri Plaintiffs, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

399.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Missouri Plaintiffs, about the true

environmental cleanliness and efficiency of the Fraudulent Vehicles, the quality of the Defendants' brands, the devaluing of environmental cleanliness and integrity of Defendants, and the true value of the Fraudulent Vehicles.

400.    Defendants' violations present a continuing risk to the Missouri Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

401.    Defendants are liable, and the Missouri Plaintiffs hereby sue, for actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in amounts to be proven at trial plus attorneys' fees and costs per Mo. Rev. Stat. § 407.025(1) plus punitive damages plus any other just and proper relief under Mo. Rev. Stat. § 407.025.

**OHIO**

402.    Plaintiffs Nancy Flint and Jon Wilkins (the "Ohio Plaintiffs") acquired a Fraudulent Vehicle while in the State of Ohio.   As such, the Ohio Plaintiffs bring the following causes of action against all defendants.

**OHIO COUNT 1- FRAUD**
**(On behalf of the Ohio Plaintiffs)**

403.    The Ohio Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

**A.    Affirmative Misrepresentation**

404.    The Ohio Plaintiffs asserts this affirmative misrepresentation theory of fraud against the Fiat Chrysler Defendants and VM Motori Defendants.

405.    Fiat Chrysler branded each Fraudulent Vehicle with the Ecodiesel badge. Through the badge, Fiat Chrysler communicated to the Ohio Plaintiffs that the Fraudulent Vehicles were,

117

among other things, environmentally friendly.

406.    This was a material fact, as Fiat Chrysler's own research and communications demonstrate. Fiat Chrysler's representations were false because the Fraudulent Vehicles contain undisclosed emission cheating components that cause them to pollute excessively in real-world driving conditions.

407.    Fiat Chrysler and VM Motori knew the representations were false and intended the Ohio Plaintiffs to rely on them.

408.    The Ohio Plaintiffs decided to acquire the Fraudulent Vehicle based in part on the representations communicated through the Ecodiesel badge, and they relied on such representations to their detriment.

**B.    Fraudulent Concealment: Fuel Economy and Performance Representations**

409.    The Ohio Plaintiffs assert this fraudulent concealment theory against all Defendants.

410.    Again, Fiat Chrysler branded each Fraudulent Vehicle with the Ecodiesel badge, which communicated not only that the Fraudulent Vehicles were environmentally friendly, but also that they were fuel efficient.

411.    The fuel economy and performance representations were also the centerpiece of Fiat Chrysler's marketing efforts and featured prominently in virtually every advertisement and consumer communication. As detailed above, through dealership training materials leading to representations at the point of sale, vehicle brochures, the manufacturer websites, print advertisements, television advertisements, and other avenues, Fiat Chrysler pervasively and consistently represented that the Fraudulent Vehicles had best in class fuel economy and touted their specific MPG and range, as well as their supposedly superior torque and performance.

412.    Defendants concealed and suppressed the fact that the Fraudulent Vehicles could achieve their fuel efficiency and power only through undisclosed cheating components that cause them to pollute excessively.  This was a material fact about which the Defendants had knowledge, and that they concealed from the Ohio Plaintiffs to mislead the Ohio Plaintiffs.

413.    The Ohio Plaintiffs did not know this fact and could not have discovered it through reasonably diligent investigation.

414.    Defendants had a duty to disclose that the emission treatment technology in the Fraudulent Vehicles is de-activated or reduced under real-world driving conditions because (1) the Defendants had exclusive knowledge of the material, suppressed facts; (2) the Defendants took affirmative actions to conceal the material facts, including by not identifying them for the EPA and CARB; and (3) Fiat Chrysler made partial representations about the environmental friendliness, fuel economy, and performance of the Fraudulent Vehicles that were misleading without disclosure of the fact that the Fraudulent Vehicles contained hidden emission cheating components that  caused the Fraudulent Vehicles to pollute excessively in real-world driving conditions.

415.    The Ohio Plaintiffs decided to acquire the Fraudulent Vehicle based in part on the representations communicated through the Ecodiesel badge and other consistent and pervasive consumer communications concerning fuel economy and efficiency,  and they relied on such representations to their detriment.

C.    **Fraudulent Concealment: Installing and Concealing the Defeat Devices**

416.    The Ohio Plaintiffs asserts this fraudulent concealment theory against all Defendants.

417.    Each Defendant committed fraud by installing and calibrating emission control

devices in the Fraudulent Vehicles, which were unlawfully concealed from regulators and consumers alike. In uniform advertising and materials provided with each Fraudulent Vehicle, the Fiat Chrysler Defendants concealed from the Ohio Plaintiffs that the emission treatment technology de-activated under real-world driving conditions.

418.     The Fiat Chrysler Defendants intentionally concealed, suppressed, and failed to disclose the facts that the Fraudulent Vehicles had defective emission controls and/or emitted unlawfully high levels of pollutants such as NOx. These Defendants, along with VM Motori and the Bosch Defendants, knew or should have known the true facts, due to their involvement in the design, installment, and calibration of the emission treatment technology in the Fraudulent Vehicles. And yet, at no time did any of these Defendants reveal the truth to the Ohio Plaintiffs. To the contrary, each Defendant concealed the truth, intending for the Ohio Plaintiffs to rely— which the Ohio Plaintiffs did.

419.     A reasonable consumer would not have expected that the emission treatment technology in the Fraudulent Vehicles de-activated under real-world driving conditions or that the Fraudulent Vehicles would spew unmitigated NOx during city or highway driving. The Ohio Plaintiffs did not know of the facts which were concealed from the Ohio Plaintiffs by Defendants. Moreover, as a consumer, the Ohio Plaintiffs did not, and could not, unravel the deception on their own.

420.     Defendants had a duty to disclose that the emission treatment technology is de-activated under real-world driving conditions and that the Fraudulent Vehicles spewed unmitigated NOx during real-world conditions. Defendants had such a duty because the true facts were known and/or accessible only to them and because they knew these facts were not known to or reasonably discoverable by Plaintiffs.

421.     Fiat Chrysler and VM Motori also had a duty to disclose the true nature of the emission controls in light of their statements about the qualities of the Ecodiesel® engines and the Fraudulent Vehicles' emissions levels, which were misleading, deceptive, and incomplete without the disclosure of the fact that the emission treatment technology is de-activated under real-world driving conditions and that the Fraudulent Vehicles spewed unmitigated NOx during real-world conditions.  Fiat Chrysler held out the Fraudulent Vehicles as reduced emission diesel vehicles, when in fact, they were unlawfully high emission vehicles.  Having volunteered to provide information to the Ohio Plaintiffs, Fiat Chrysler and VM Motori had the duty to disclose the whole truth.  On information and belief, Fiat Chrysler has still not made full and adequate disclosures and continues to defraud the Ohio Plaintiffs by concealing material information regarding the emissions qualities of the Fraudulent Vehicle.

422.     But for Defendants' fraud, the Ohio Plaintiffs would not have acquired the Fraudulent Vehicle, or would have paid less for it.  The Ohio Plaintiffs have sustained damage because they acquired vehicles that were not as represented and because they own Fraudulent Vehicles that should never have been placed in the stream of commerce and are diminished in value as a result of Defendants' fraud.  Accordingly, Defendants are liable to the Ohio Plaintiffs for damages in an amount to be proven at trial.

423.     Defendants are liable to the Ohio Plaintiffs for damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be proven at trial, for which the Ohio Plaintiffs sues Defendants. Defendants acted with willfulness, fraud, malice, and wantonness.  Further, Defendants have acted with express and actual malice, legal and implied.

Defendants' conduct thus warrants the award of substantial punitive damages in an amount to be determined at trial, for which the Ohio Plaintiffs sue Defendants.

## OHIO COUNT 2-
### VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES ACT
(Ohio Rev. Code §§ 1345.01, *et seq.*)
(On behalf of the Ohio Plaintiffs)

424.    The Ohio Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

425.    The Ohio Plaintiffs have complied with all applicable, pre-suit notice letter provisions, if any.

426.    Defendants and the Ohio Plaintiffs are "persons" within the meaning of Ohio Rev. Code § 1345.01(B).

427.    Defendants are a "supplier" as defined by Ohio Rev. Code § 1345.01(C).

428.    The Ohio Plaintiffs is a "consumer" as that term is defined in Ohio Rev. Code § 1345.01(D), and their purchase and leases of the Fraudulent Vehicles installed in them are "consumer transactions" within the meaning of Ohio Rev. Code § 1345.01(A).

429.    Ohio Rev. Code § 1345.02, prohibits unfair or deceptive acts or practices in connection with a consumer transaction. Ohio Consumer Sales Practices Act prohibits a supplier from (i) representing that goods have characteristics, uses or benefits which the goods do not have; (ii) representing that their goods are of a particular quality or grade that the product is not; and (iii) representing that the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not. Defendants knowingly violated the Ohio CSPA.

430.    In the course of their business, through their agents, employees, and/or subsidiaries, Defendants violated the Ohio CSPA.

431.    As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively

122

misrepresented the environmental friendliness and emissions of the Fraudulent Vehicles through the Ecodiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Fraudulent Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the Ecodiesel badge and uniform and pervasive consumer communications, the Fraudulent Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Fraudulent Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Fraudulent Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and the Ohio Plaintiffs alike. In so doing, and by marketing, offering for sale, and selling the defective Fraudulent Vehicles, Defendants violated the Ohio CSPA

432.    Defendants' scheme and concealment of the true characteristics of the Ecodiesel® emission control system were material to the Ohio Plaintiffs, as Defendants intended. Had they known the truth, the Ohio Plaintiff would not have acquired the Fraudulent Vehicle, or—if the Fraudulent Vehicles' true nature had been disclosed and mitigated—would have paid significantly less for them. The Ohio Plaintiffs suffered ascertainable loss and actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. The Ohio Plaintiffs also suffered diminished value of the vehicle, as well as lost or diminished use.

433.   The Ohio Plaintiffs had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. The Ohio Plaintiff did not, and could not, unravel Defendants' deception on his own.

434.   Defendants had an ongoing duty to the Ohio Plaintiffs to refrain from unfair and deceptive practices under the Ohio CSPA in the course of their business.  Specifically, Defendants owed the Ohio Plaintiffs a duty to disclose all the material facts concerning the Ecodiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from the Ohio Plaintiffs, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

435.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Ohio Plaintiffs, about the true environmental cleanliness and efficiency of the Fraudulent Vehicles, the quality of the Defendants' brands, the devaluing of environmental cleanliness and integrity of Defendants, and the true value of the Fraudulent Vehicles.

436.   Defendants' violations present a continuing risk to the Ohio Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

437.   Pursuant to Ohio Rev. Code § 1345.09, the Ohio Plaintiffs hereby sues Defendants for actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) plus treble damages plus attorneys' fees and costs per Ohio Rev. Code § 1345.09 plus

non-economic damages plus any other just and proper relief, to the extent available under the Ohio CSPA.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs, respectfully request that the Court enter judgment in Plaintiffs' favor and against Defendants, as follows:

    A.    Economic damages, non-economic damages (including, without limitation, damages for emotional distress, embarrassment, humiliations, and mental anguish), and disgorgement of Defendants' profits or unjust enrichment in an amount to be determined at trial;

    B.    Statutory damages;

    C.    Rescission of the contracts for sale or lease;

    D.    Punitive and additional damages;

    E.    An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

    F.    An award of costs and attorneys' fees; and

    G.    Such other or further relief as may be appropriate.

DATED: August 14, 2019

Respectfully submitted,

*/s/ Clifford Paskel*
Clifford Paskel (P18680)
Michael Z. Zavier (P76438)
**PASKEL, TASHMAN & WALKER, P.C.**
24445 Northwestern Highway
Suite 102
Southfield, MI 48075
248-353-7750 Phone
248-353-2253 Fax

Admission *Pro Hac Vice*
to be Sought for:

MICHAEL E. HEYGOOD,
ERIC D. PEARSON,
CHARLES W. MILLER
Texas Bar No. 15690472
**HEYGOOD, ORR & PEARSON**
6363 North State Highway 161,
Suite 450
Irving, Texas 75038
Telephone: (214) 237-9001
Facsimile: (214) 237-9002

**ATTORNEYS FOR PLAINTIFFS**

126